LESTER WILLIAM ROTH AND GERTRUDE F. ROTH, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87703, 87704, 90952–90954. Filed April 30, 1962.

*Lehman C. Aarons, Esq.*, for the petitioners.
*Lawrence S. Kartiganer, Esq.*, for the respondent.

WITHEY, *Judge:* Respondent has determined deficiencies in the income tax of petitioners as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 87703 | 1955 | $4,485.00 |
| 87704 | 1955 | 2,532.21 |
| 90952 | 1956 | 336.43 |
| 90953 | 1956 | 336.43 |
| 90954 | 1956 | 783.43 |

The sole issue to be decided is whether amounts received by petitioners in 1955 and 1956 representing a percentage of the gross receipts from the distribution of a motion picture constitute ordinary income or capital gain.

[1] Proceedings of the following petitioners are consolidated herewith: George W. Cohen, Docket Nos. 87704, 90952; Carolyn F. Cohen, Docket No. 90953; Lester William Roth and Gertrude F. Roth, Docket No. 90954.

FINDINGS OF FACT.

The agreed facts are found as stipulated.

Petitioners, Lester William Roth and Gertrude F. Roth, husband and wife and residents of California, filed joint income tax returns for the calendar years 1955 and 1956 with the director of internal revenue at Los Angeles, California. Petitioners, George W. Cohen and Carolyn F. Cohen, are husband and wife and residents of California. George W. Cohen filed a separate income tax return for the calendar year 1955. George W. Cohen and Carolyn F. Cohen filed separate income tax returns for the calendar year 1956 with the director of internal revenue at Los Angeles.

During all pertinent years, George W. Cohen and Lester William Roth were partners in the law partnership known as Cohen & Roth, each having a 50-percent interest in the capital and profits of the law partnership.

During all pertinent years, Cohen & Roth represented Danny Kaye, a well-known actor. On November 15, 1952, a partnership known as Dena Productions was formed by Danny Kaye, his wife, Sylvia Fine, and others for the purpose of engaging in the business of producing, distributing, exploiting, and turning to account motion-picture photoplays. A new partnership agreement for the same purposes was entered into November 1, 1953, following the death of Robert E. Kopp, one of the minority partners. Cohen & Roth were members of the original and successor Dena Productions partnerships, having invested $1,600 at the inception (November 1952) out of a total of $50,000 invested capital for which Cohen & Roth received a 3.2-percent interest in Dena Productions.

Dena Productions produced a motion-picture photoplay known as "Knock on Wood." This picture was released for distribution in July 1954. It was released by Paramount Pictures Corporation pursuant to a distribution agreement which had been entered into on February 15, 1953, between Dena Productions and Paramount.

Under the distribution agreement, Paramount had distribution rights for a period of 10 years. During this term, Dena Productions could sell or otherwise dispose of its property rights in the picture if Paramount consented. After 4 years, Dena Productions could publish "Knock on Wood" in book form or for legitimate stage purposes without obtaining Paramount's consent.

Paramount, in the distribution agreement, made no guarantee whatever that the gross receipts from the picture would amount to any specified sum or sums. It agreed merely to use its best efforts, in good faith, to secure the largest return reasonably practicable and consistent with sound business policy and practice.

Neither Cohen nor Roth customarily had invested in motion-picture ventures or other ventures of their clients. Cohen had made one such investment 10 years previously in a motion-picture venture. Roth had never invested in any other motion-picture venture.

The original investment by Cohen and Roth in Dena Productions was made by them reluctantly. It was their policy not to invest in their clients' ventures. They were invited by Danny Kaye and his wife to make this investment; they were advised that attorneys for other partners were going to invest; and they felt that failure to invest might erroneously be construed as a lack of confidence.

On August 9, 1954, petitioners executed an untitled instrument wherein it is provided that petitioners "do hereby sell and assign their entire interest in the partnership [Dena Productions]" to Dan-Syl Corporation (a corporation owned by Kaye and his wife). Petitioners were thereunder to receive 3.2 percent of amounts payable by Paramount under the distribution agreement for a period of 7 years, at the expiration of which Dan-Syl agreed to pay petitioners in a lump sum "an amount equal to the then reasonable value of the residual interest in said photoplay referrable [sic] to the Cohen & Roth interest." In other words, petitioners were to be paid 3.2 percent of such residual value. If Dan-Syl were to thereafter assign its interest in the photoplay, it had the option either to subject the assignee to the payment provisions above set forth or to assign the same free of such obligation provided 3.2 percent of the "purchase price," less expenses incidental to the assignment, was to be treated as "gross receipts," i.e., paid to petitioners.

At the date of the above agreement, there was nothing owing to Dena Productions under the Paramount distribution agreement. As of that date, Paramount had about $700,000 of its production advances still to recoup before any sums became payable to Dena Productions.

Dan-Syl Corporation by change of name became Dena Pictures, Inc. In the years 1955 and 1956, Cohen and Roth received from Dena Pictures, Inc., under the sales agreement of August 9, 1954, the respective sums of $23,232 and $7,249.46. Dena Pictures, Inc., in turn, reflected these payments on its own books as increases in its investment in the partnership, Dena Productions.

Prior to the above agreement Dena Productions had completed the production of "KNOCK ON WOOD."

ULTIMATE FINDING.

The agreement of August 9, 1954, between petitioners and Dan-Syl Corporation had no economic significance in that by it nothing of substance was transferred between the parties thereto.

174

In "selling" their partnership interest, petitioners sold *nothing* of taxable consequence, neither the "tree" nor the "fruit." The "fruit" consisted only of the amounts paid the partners from the rentals of the only partnership asset, the picture (the "tree"). *All of petitioners' interest in these rentals was retained by them.* All of their interest in the ownership of the picture was retained by them, i.e., 3.2 percent of the residual value thereof at 7 years of age or whenever it was sold. Neither the tree nor the fruit having been parted with by petitioners, and the receipts in the years at issue being the fruit, their receipts constitute ordinary income. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260; *Paul W. Trousdale*, 16 T.C. 1056, affd. 219 F. 2d 563; *Tunnell* v. *United States*, 259 F. 2d 916. What petitioners did part with was of no economic significance. It was nothing but the bare legal title to their partnership interest, the name of the tree which, so far as this record shows, had no value to anyone. They retained the entire economic substance of their partnership interest and parted with an economic nullity. No sale or exchange of a capital asset within the meaning of section 1221 of the Internal Revenue Code of 1954 took place.

It might be argued that by virtue of the "sales" contract provision, that petitioners could be bought out at the end of 7 years, petitioners parted with the right to receive the picture rentals for a period of 3 years which they had under the original partnership arrangement, but we likewise can see no economic significance to that argument. So far as the record shows there well might have been no ascertainable value to the 3-year right. If there was such a value, it is reasonable to conclude that petitioners' 3.2 percent interest in "the residual value" of the picture would have been greater at the expiration of 7 years or any lesser period than at the expiration of the 10-year period which represented the term of the partnership agreement. Obviously this greater value would be an offset against any rights to rentals for a 3-year period waived by petitioners in their assignment to Dan-Syl Corporation. To what extent the offset would wipe out or exceed the value of the waived 3-year rental right is not disclosed by this record and we must therefore conclude, under the presumption of correctness of respondent's determination, that the offset would have been complete.

Having so concluded, it is clear that section 751 of the 1954 Code, upon which respondent bases his alternative contention, has no application to the case at bar because no sale or exchange of a partnership interest within the meaning thereof has taken place.

We cannot conclude otherwise than that the assignment of petitioners' partnership interest had no economic substance and therefore no significance taxwise.

*Decisions will be entered for the respondent.*