JOHN WINTHROP WOLCOTT AND DOROTHY F. WOLCOTT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87299.    Filed December 18, 1962.

*George W. McManus, Jr., Esq.*, for the petitioners.
*Arnold E. Kaufman, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1955 and 1956 in the amounts of $2,434.06 and $135.49, respectively.

The issue for decision is whether the amount of cash received by petitioner, John Winthrop Wolcott, from his former partner and the cancellation of petitioner's indebtedness to the firm pursuant to an agreement settling and disposing of the assets of their dissolved partnership is taxable as ordinary income or as capital gain.

### FINDINGS OF FACT.

Some of the facts, with exhibits attached, have been stipulated and are incorporated herein by this reference.

Petitioners John Winthrop Wolcott and Dorothy F. Wolcott, husband and wife residing in Baltimore, Maryland, filed their joint income tax returns for 1955 and 1956 with the district director of internal revenue, Baltimore, Maryland. John Winthrop Wolcott will be referred to herein as petitioner. Dorothy F. Wolcott is involved only because she filed joint returns with petitioner.

Petitioner was individually engaged in the practice of architecture from 1916 to 1947. In 1947 he formed a partnership with Eben D. Finney and Eugene R. Smeallie (hereinafter referred to as Finney and Smeallie, respectively) for the practice of architecture under the name of Finney, Wolcott and Associates. Smeallie's interest in the partnership was terminated sometime in 1950, and from that time to the partnership's dissolution on or about May 31, 1955, petitioner and Finney were the only partners in the firm.

Sometime early in 1955, petitioner decided, in view of certain activities of Finney's which he considered harmful to the partnership business, that the partnership should be dissolved and the business liquidated. With this purpose in mind, petitioner attempted to take control of the partnership business and liquidate it, but after a week of pursuing this course, he found himself barred from entrance to the partnership offices by a new lock on the door. Immediately thereafter he sought relief in the courts for a determination as to who should take over the partnership business and liquidate it.

On July 20, 1955, a written agreement was entered into by petitioner and Finney effecting a complete settlement and disposition of the dissolved partnership assets and liabilities and all claims of either petitioner or Finney against the other. This agreement provided that petitioner should receive, in addition to certain personal property belonging to the firm or located in the firm's offices, all the firm's interest in four contracts for architectural services, including all drawings and papers related thereto, and the right to take over and complete these contracts. Petitioner also assumed all liabilities thereunder. The agreement further provided that petitioner was to be released from all liability for an overdraft in his partnership capital account of $1,198.34, and that Finney was to pay petitioner the sum of $10,000, to be paid $5,000 down and $750 per month. Finney received under the agreement all the other property of the partnership of every sort and description, including all drawing and other equipment, furniture and fixtures, bank accounts (which according to the agreement had a balance of $865.20), accounts receivable, and all remaining partnership contracts for architectural services for which he also assumed full responsibility and liability.

A final income tax return was filed for the partnership for the period November 1, 1954, to May 31, 1955. It reported net profit of $18,368.23.

The balance sheet accompanying the partnership's final return of income reported the following:

ASSETS

| | | |
|---|---:|---:|
| Cash | | $4, 421. 96 |
| Buildings and other fixed depreciable assets | $4, 240. 43 | |
| Less accumulated depreciation | 2, 033. 33 | 2, 207. 10 |
| Other assets | | 28. 50 |
| Total assets | | 6, 657. 56 |

LIABILITIES AND CAPITAL

| | | |
|---|---:|---:|
| Accounts and notes payable | | 2, 504. 07 |
| Partners' capital accounts— | | |
| E. D. Finney | $5, 351. 83 | |
| J. W. Wolcott | (1, 198. 34) | |
| Total liabilities and capital | | 6, 657. 56 |

At the time the partnership was dissolved, it had approximately 20 contracts for architectural services. The four received by petitioner were with municipal bodies. Of the 16 received by Finney, at least 6 were with private individuals or parties whose association with the firm was the result of their acquaintanceship or friendship with him. Proximate to the time of the settlement petitioner made an oral agreement with Finney that he would not solicit business from some of these individuals or their families.

At the time of its dissolution, the partnership had billed and received payment for most of the fees due or drawable on the contracts held by it at that time. Further fees, however, were due on all or most of these contracts subject to the rendition of future architectural services or to the completion of the projects or buildings called for therein.

Although he was active in acquiring business for the partnership, including some called for in the contracts that existed at the time the partnership was dissolved, petitioner's activities in the partnership were primarily confined to the management of its office. Finney had been predominant in architectural affairs and in promoting new business, and a majority of the partnership business was the result of his efforts and friendships.

The settlement agreement was the culmination of negotiations between petitioner, his attorney, and Finney's attorney. Finney was not present at any of the negotiations. The amount of the cash payment Finney made to petitioner under the agreement was arrived at through negotiations, but the agreement did not specify what the payment was for or why petitioner's debt to the firm was canceled.

After the dissolution of Finney, Wolcott and Associates, petitioner continued the practice of architecture on his own. He completed

three of the four contracts received by him under the settlement agreement and reported the income received therefrom as ordinary income.

After the dissolution of the partnership, Finney practiced architecture as a sole proprietor under the name of Finney and Associates for approximately 7 months, after which he practiced in partnership with former employees of Finney, Wolcott and Associates, who had remained in his employ after the dissolution of that firm, under the name of Finney, Dodson, Smeallie, Orrick and Associates. Finney died before the trial of this case.

In compliance with the provision in the partnership settlement agreement, Finney paid to petitioner the sum of $8,587.10 during the calendar year 1955, and the sum of $1,250 during the calendar year 1956. In filing his income tax returns for 1955 and 1956, petitioner treated his transaction with Finney as a sale or exchange of a capital asset with the proceeds therefrom constituting long-term capital gains.[1] Respondent determined that these payments were taxable as ordinary income.

Petitioner's basis in the partnership of Finney, Wolcott and Associates was zero.

#### ULTIMATE FINDING.

The cash payments made to petitioner by Finney and the cancellation of petitioner's indebtedness to the firm pursuant to the settlement agreement were attributable to petitioner's interest in the uncompleted contracts assigned to Finney under the agreement.

#### OPINION.

The sole question is whether the $8,587.10 cash received by petitioner from Finney in 1955, plus the cancellation of his indebtedness to the firm in the amount of $1,198.34, and the $1,250 cash received by petitioner from Finney in 1956, all pursuant to a settlement agreement dated July 20, 1955, entered into between petitioner and Finney upon dissolution of their architectural partnership, are taxable as ordinary income, as determined by respondent, or as capital gain, as claimed by petitioner.[2]

Respondent contends the amounts are attributable to petitioner's interest in the uncompleted contracts for architectural services held by the partnership at the time of dissolution which were assigned to Finney, or "unrealized receivables" within the meaning of section

---

[1] On his 1955 tax return, petitioner did not report the full $8,587.10 he received from Finney in that year but in his petition and in the stipulation of facts he has conceded that this was the amount he received in 1955 from Finney in connection with this transaction and that his basis in the partnership was zero.

[2] Petitioner agreed at the trial that for purposes of this case, the amount of the debt canceled should be treated the same as the cash received.

751 (a) and (c) of the 1954 Code,[3] and are thus taxable as ordinary income. Petitioner contends the amounts were for a sale of his interest in the partnership or partnership assets other than unrealized receivables, principally goodwill, and are therefore taxable as capital gain.

The written agreement does not state what the payments were for. Finney was deceased at the time of the trial. Petitioner testified that the amount was arrived at by bargaining or "horse trading" but did not relate what factors were discussed or considered in the negotiations. He did testify that the $10,000 payment "was for the good will that was built up, and to get me out of the business * * *"; but he did not say this was considered in the negotiations. This would seem to be merely his conclusion. If petitioner actually attended all the negotiation conferences, it seems unlikely that he was entirely candid in his testimony. He did testify that he was never shown any figures relating the $10,000 to work in process or the uncompleted contracts.

Neither of the attorneys who conducted the negotiations was called as a witness by either party. The only other person who appears to have participated in the negotiations was Wright, the accountant for the partnership who was called as a witness by petitioner. He testified simply that the $10,000 figure was arrived at by negotiation, that various figures and the pending lawsuit were mentioned in the negotiations, that there was no mention of unbilled receivables, and that while the uncompleted contracts were discussed this had nothing to do with determining the amount of the payment.

Respondent attempted to prove that the $10,000 cash payment, plus the cancellation of petitioner's overdraft and the estimated profits he would receive from the four contracts assigned to petitioner, represented petitioner's share of the estimated partnership profits that would be realized upon completion of all the uncompleted contracts on the partnership books at the time of dissolution of the partnership.

---

[3] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS.

(a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.—The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—

(1) unrealized receivables of the partnership, or

(2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) UNREALIZED RECEIVABLES.—For purposes of this subchapter, the term "unrealized receivables" includes, to the extent not previously includible in income under the method of accounting used by the partnership, any rights (contractual or otherwise) to payment for—

(1) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or

(2) services rendered, or to be rendered.

Finney not being available to testify, respondent attempted to prove this by the testimony of two architects who were employees of the firm at the time of dissolution and who remained with Finney and later became his partners. They testified that at Finney's request one of them went through the partnership books and determined what the average percentage of profit on fees received in the past had been, what uncompleted contracts were on the books at that time, what the estimated gross receipts and costs on those contracts would be, and the estimated partnership profit on all those contracts when completed. He applied petitioner's partnership percentage to the latter figure and arrived at the sum of $15,927 as petitioner's share of those estimated profits. He then proposed a settlement for Finney of $10,000 cash, $1,198 forgiveness of petitioner's debt, and $4,451 as the estimated profit to be realized on the contracts assigned to petitioner. This computation was given to Finney, who thereupon called his attorney in the presence of one of the witnesses and told him to settle on the proposed basis. Finney did not personally participate in any of the negotiations and there is no evidence that these computations were actually used in the settlement negotiations.

Petitioner objected to all of the above-recited evidence and the witness' written computations offered as an exhibit by respondent, on the grounds of relevancy and competency. The Court received the evidence, not as proof of the accuracy of the figures or that they were used in the negotiations, but only as proof that the exhibit was prepared by the witness at Finney's request and that upon receipt thereof he called his attorney and instructed him to settle on that basis. Since conclusion of the trial, petitioner filed a motion to strike the above evidence. We hereby deny the motion to strike. We think the evidence is competent for the purpose received and, because of the unavailability of Finney as a witness and the absence of better evidence, has some probative value as proof of what was in Finney's mind at the time of the negotiations and what he considered the payments to be for. 1 Wigmore, Evidence, sec. 102 (3d ed. 1940); 6 Wigmore, Evidence, secs. 1714, 1725 (3d ed. 1940).

The transaction between petitioner and Finney was clearly not a sale by petitioner of his entire partnership interest to Finney. The agreement referred to the prior dissolution of the partnership and purported to be a division of the partnership assets and settlement of the partners' claims, one against the other.

On the evidence presented it is difficult to determine just what the payments to petitioner were intended to cover. We do not think they were for partnership tangible assets or goodwill. The balance sheet on the final partnership return listed depreciable and other assets in a net amount of approximately $2,235. We have no way of knowing

what portion of this figure was represented by tangible assets assigned to petitioner and those assigned to Finney in the settlement agreement. Most of the cash shown on the balance sheet was apparently used to pay the accounts payable. Ordinarily transferable goodwill does not attach to personal service partnerships or firms whose success is primarily dependent on the personal qualifications and abilities of its members. *Malcolm J. Watson*, 35 T.C. 203 (1960). No goodwill was shown on the balance sheet and the settlement agreement makes no reference to goodwill or future use of the firm name or other symbols of the partnership that would invoke a favorable response from clients. *Merle P. Brooks*, 36 T.C. 1128 (1961). There were no restrictions in the agreement on the future practice of architecture by either petitioner or Finney. The evidence indicates that Finney brought in most of the business and was the principal architect. It seems highly improbable to us that under these circumstances Finney would have paid petitioner $10,000 for goodwill or the tangible assets of the firm, other than the contracts for work to be done.

On the other hand, at the time of dissolution petitioner was entitled to share in the profits the firm might realize on all of the uncompleted contracts then on the books, resulting both from work that had already been done and from work that had to be done to complete the contracts. Finney was assigned 16 of the 20 active contracts and became entitled to all the profits that might be derived therefrom. Petitioner was assigned only four of the contracts. The evidence indicates that at least Finney took this disparity into consideration in advising his lawyer of his terms for settlement. It seems most likely that Finney's payment of $10,000 to petitioner over a period of time and the cancellation of petitioner's debt to the firm was attributable to petitioner's interest in the contracts assigned to Finney and the profits estimated to be derived therefrom, and we have so concluded in our Findings of Fact. There appears to be little else of value assigned to Finney which would support Finney's payments to petitioner.

Petitioner introduced expert testimony that the partnership contracts as a whole constituted a loss to the partnership at the time of its dissolution. We cannot attach much weight to this testimony because the witness also testified that although the partnership appeared to be losing money on these contracts at the time of dissolution, this did not mean that there would necessarily be a loss on them upon their completion.

The next question is whether the amounts so received by petitioner, which we have found represent payment for petitioner's interest in the uncompleted contracts assigned to Finney under the agreement, constitute amounts received in exchange for petitioner's interest in the partnership attributable to "unrealized receivables" within the

meaning of section 751. If they do, that section, being effective with respect to gains to a seller or distributee in the case of a sale, exchange, or distribution occurring after March 9, 1954, even though the partnership year started before January 1, 1955, see sec. 771, would require that they be taxed as ordinary income.[4]

Prior to enactment of the 1954 Code there was a conflict of authority on whether payments received on the sale of a partnership interest representing the seller's share of uncollected fees were taxable as capital gain or ordinary income. Some courts held that the sale of a partnership interest resulted in capital gain regardless of the nature of the underlying assets, *Swiren* v. *Commissioner*, 183 F. 2d 656 (C.A. 7, 1950); *Hatch's Estate* v. *Commissioner*, 198 F. 2d 26 (C.A. 9, 1952); *Berry* v. *United States*, 267 F. 2d 298 (C.A. 6, 1959); while others, including this Court, held that amounts received by a retiring or selling partner for his interest in uncollected fees, at least those already earned, were taxable as ordinary income, *Helvering* v. *Smith*, 90 F. 2d 590 (C.A. 2, 1937); *United States* v. *Snow*, 223 F. 2d 103 (C.A. 9, 1955); *James Wesley McAfee*, 9 T.C. 720 (1947); *B. Howard Spicker*, 26 T.C. 91 (1956). What the answer would have been had the payment been a lump-sum advance for the privilege of completing the contracts and collecting the entire compensation was uncertain. See *Virgil L. Beavers*, 31 T.C. 336, 340 (1958).

While we find no case interpreting section 751, the congressional committee reports indicate that Congress was aware of the confusion and also of the opportunity afforded for converting what would be ordinary income into capital gain by selling a (so-called collapsible) partnership interest after a part of the work was done but before the fees were collected, and that section 751 was intended to prevent such conversions. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 98 (1954). Section 741 affords capital gains treatment to the gain on sale or exchange of an interest in a partnership, except as otherwise provided in section 751. Section 731 provides that gain or loss shall not be recognized to a partner in

---

[4] The settlement agreement refers to the partnership as having been dissolved and effects a division of the firm's assets and liabilities. While section 751 refers to a sale or exchange of an interest in a partnership and neither that section, sections 736, 741, nor any other section of subchapter K refers specifically to distributions on dissolution of a partnership, we think section 751 was intended to apply under circumstances such as here present, provided the payments were attributable to "unrealized receivables." The Senate Finance Committee report, S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 98 (1954), in discussing sections 751–755, states:

"In order to prevent the conversion of potential ordinary income into capital gain by virtue of transfers of partnership interests or by distributions of property, certain rules have been adopted by the House and your committee which will apply to all dispositions of partnership interests. * * *"

Had the distribution been effected by distributing to each partner an undivided interest in all the contracts and then the contracts had been divided, with Finney paying petitioner cash because he took the bulk of the contracts, the result would have been the same. See sec. 735.

the case of a distribution (distinguished from distributive share) by a partnership to a partner except to the extent that any money received exceeds the partner's basis in his partnership interest, and that any gain recognized will be considered gain from the sale or exchange of a partnership interest, but subsection (c) makes the section inapplicable to the extent otherwise provided in section 751. And section 735 provides that the gain on disposition by a distributee partner of unrealized receivables (as defined in section 751) distributed by a partnership shall be considered gain from the sale or exchange of property other than a capital asset.

Section 751(a) provides that amounts received by a transferor partner in exchange for his interest in the partnership *attributable* to unrealized receivables of the partnership shall be considered gain from the sale or exchange of property other than a capital asset. We assume this would apply as well to amounts received in exchange for an interest in partnership assets which qualify as unrealized receivables which a partner had received on dissolution of the partnership. Section 751(c) defines "unrealized receivables" as including any rights to payment for "services rendered, or to be rendered." These provisions seem to leave little doubt that amounts received attributable to fees earned under personal service contracts but not collectible at the time of sale qualify as unrealized receivables and are taxable as ordinary income whether received in connection with the sale of an entire partnership interest or an interest in partnership assets received as a distribution. And they would seem to leave little doubt that amounts received attributable to a partner's interest in contracts for personal services "rendered, or to be rendered" would also qualify as "unrealized receivables" under the above definition and would be taxable as ordinary income under either of the above circumstances. Section 1.751–1(c), Income Tax Regs., recognizes that the right to share in such payments must have arisen under contracts in existence at the time of the sale but also provides that the term includes rights to payment for work or goods begun but incomplete at the time of sale. The regulations accept any arm's-length agreement of the parties as to the part of the sales price attributable to unrealized receivables. In the absence of such agreement, full account is to be taken of the cost of completing the contract and the length of time involved in arriving at the amount attributable to unrealized receivables. This clearly contemplates that additional work will have to be done before the income is collectible.

In our opinion, section 751 was intended to and does apply not only to payments attributable to the selling partner's interest in the profit from existing contracts for services already performed at the time of sale but also to payments for his interest in the profit from such contracts that might be attributed to services that will have to be

performed in the future to complete such contracts. Inasmuch as we have found that the payments here involved were *attributable* to petitioner's share of the estimated profits that would be realized upon completion of the contracts assigned to Finney, we conclude that section 751 applies thereto and requires that they be taxed as ordinary income. If any part of the amounts involved was attributable to something other than unrealized receivables, petitioner has given us no basis for making an allocation.

Reviewed by the Court.

*Decision will be entered for the respondent.*

FAY, *J.*, did not participate in the consideration or disposition of this case.