HERMAN GLAZER AND MOLLIE GLAZER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4852–63, 4972–63, 4973–63. Filed July 9, 1965.

*Marvin J. Levin,* for the petitioners.
*Edward L. Newberger,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith : Forrest B. Fleisher, docket No. 4972–63 ; and Estate of David Fleisher, ·Deceased, Frances E. Fleisher, Executrix, and Frances E. Fleisher, docket No. 4973–63.

OPINION

RAUM, *Judge:* The Commissioner determined the following deficiencies in income tax for the year 1959:

| Taxpayer | Deficiency | Additions to tax, sec. 6654, I.R.C. 1954 |
|---|---|---|
| Herman and Mollie Glazer | $14,709. 60 | [2] $307. 96 |
| Forrest B. Fleisher | 2, 368. 52 | |
| Estate of David Fleisher, deceased, Frances E. Fleisher, executrix, and Frances E. Fleisher | 661. 84 | |

The only issue remaining for decision is whether the gain to the petitioners arising from the purported sale of their interests in a partnership is to be treated as ordinary income or capital gain. All of the facts have been stipulated.

Petitioners Herman Glazer (hereinafter referred to as Herman) and Mollie Glazer, husband and wife, petitioner Forrest B. Fleisher (hereinafter sometimes referred to as Forrest), and David Fleisher (hereinafter sometimes referred to as David) and petitioner Frances E. Fleisher, husband and wife, were all individuals residing in Philadelphia, Pa., during the year 1959. David was Forrest's father. The Herman Glazers and David Fleishers filed their respective joint income tax returns and Forrest E. Fleisher his individual income tax return with the district director of internal revenue in Philadelphia for the calendar year 1959. Since that time David has died and Frances E. Fleisher has been appointed executrix.

In 1957 Lowell Hills, a partnership, was formed for the purpose of constructing and selling 94 single-family dwellings on a 30-acre tract of land in Upper Merion Township, Pa. The respective partnership interests were described in the stipulation of facts as follows:

5. Herman and Forrest were the active partners in the above venture. Herman was entitled to 75% of the profits of the Lowell Hills partnership. The balance of the profits accrued to the partnership Fleisher and Fleisher, which was owned two-thirds by Forrest and one-third by his father, David. Forrest had the right to represent, sign for and bind his father in all transactions pertaining to the Lowell Hills partnership.

When Lowell Hills acquired the tract of land part of it had already been subdivided. The partnership subdivided the balance and proceeded with the planned construction of the 94 single-family dwellings. The first sale by Lowell Hills occurred in 1958. In that year, 46 lots and homes were sold. Between January 1, 1959, and July 21, 1959, 24 additional lots and homes were sold. The profits therefrom were properly reported as ordinary income. As of July 21, 1959, agreements of sale had been entered into for each of the 24 remaining

[2] The Court has been informed that this $307.96 addition to tax has since been assessed and paid and is no longer in dispute.

lots and homes and construction of these homes was approximately 80 percent completed on that date.

On July 21, 1959, Herman and Forrest (acting for himself and David), as sellers, entered into an agreement with Marvin J. Levin, purporting to sell to him their partnership interests in Lowell Hills for an aggregate amount of $172,000. The parties have stipulated that "if the twenty-four remaining lots and homes had not been under agreements of sales, the sales price of the alleged partnership interest would have been $6,000 less." Levin was an attorney for Lowell Hills, and had no experience or training in the building construction field. He thereafter not only prepared the Glazers' 1959 returns but appeared as counsel for petitioners herein. The foregoing agreement with Levin contained the following provisions:

1. Each Seller hereby sells his entire partnership interests in Partnership to Purchaser for the following amount:

| | |
|---|---|
| Herman Glazer | $118,249.71 |
| Forrest Fleisher | 53,750.29 |

2. Contemporaneously herewith, Purchaser shall pay to Herman Glazer the sum of Two Thousand Two Hundred and Fifty Dollars ($2,250.00) and to Forrest Fleisher the sum of Seven Hundred and Fifty Dollars ($750.00), the receipt of which is hereby acknowledged. Purchaser shall pay the balance of the purchase price on or before June 30, 1960. In the event however, that Purchaser shall sell any of the assets heretofore owned by Partnership prior to the payment of the balance of the purchase price for the sellers' respective partnership interests, the proceeds derived therefrom shall be deposited in a bank account in the name of Sellers and disbursements therefrom shall only be made by mutual consent of the parties.

3. Inasmuch as the parties consider it to be to their mutual advantage to retain record title ownership of the real estate heretofore owned by Partnership, Sellers contemporaneously herewith shall execute and deliver to Purchaser a declaration of trust evidencing the interest of Purchaser in said real estate. In addition, Sellers shall execute and deliver any deed, mortgages, assignments or other documents which may be required by Purchaser in connection with his operation and ownership of said assets.

4. Sellers warrant and represent as follows:

(a) That the assets and liabilities of partnership are correctly and fully set forth in the attached balance sheet, marked Exhibit "A" and made a part hereof.

(b) That included in the item on said balance sheet captioned "Escrow Receivable" is the amount of Fourteen Thousand Five Hundred Dollars ($14,500.00) deposited as collateral security for acceptance of the satisfactory completion by or on behalf of Partnership of the streets and other improvements required to be completed by Partnership in connection with its construction business; that arrangements have been made for the satisfactory completion thereof so that no further expenditures with respect thereto will be necessitated by Purchaser; and that the said sum will be returned in full to Purchaser on or before June 30, 1960.

(c) That Partnership has paid, or set up reserves for the payment of, all Social Security, Withholding, sales and unemployment insurance taxes of the Federal or any local government to date.

(d) That there are no judgments, liens, actions or proceedings pending in any Court against Partnership or its property or against any of them.

5. Purchaser shall promptly pay when due all of the liabilities set out in the attached Exhibit "A" and he hereby warrants and represents that he will indemnify and save Sellers harmless from all such liabilities.

In accordance with paragraph 3 of the agreement providing that record title ownership of the real estate would not be transferred to Levin, the sellers contemporaneously executed and delivered to him a declaration of trust evidencing his alleged interest in the property. No Pennsylvania documentary stamps were affixed to either the agreement or the declaration of trust. There is a 1-percent State realty transfer tax and also a 1-percent local tax in Upper Merion Township based upon the value of the property under transfer, which are payable on the recording of documents such as deeds.

Simultaneously with the execution of the agreement, Herman and Forrest jointly entered into a contract with Levin whereby they agreed to complete the construction of the unfinished homes and the necessary street and sewer installations on or before December 31, 1959, for the sum of $65,000. The provisions regarding payment of that amount were as follows:

2. In full payment for Builders' [Herman and Forrest] Services, Owner [Levin] shall pay to them the sum of Sixty-five Thousand Dollars ($65,000.00) to be paid as follows, to wit: seventy-five percent (75%) of the value of the materials used and labor performed, as the same shall proceed, at intervals not more frequently than weekly and the final accounts to be adjusted and settled within fifteen (15) days after the said work shall have been completed, after the sum of Twenty-three Thousand Five Hundred Dollars ($23,500.00) shall have been deposited in escrow as hereinafter provide.

3. On or before the completion of the said work, Twenty-three Thousand Five Hundred Dollars ($23,500.00) of the contract price shall be deposited in such checking or saving account or accounts as the parties shall mutually agree upon in the joint names of the parties hereto, withdrawals therefrom to be made only upon the signature of all of the parties hereto; provided, however, that on July 1, 1960, if there shall be no outstanding claims by Owner against Builders at that time, the amount then on deposit shall be paid over to Builders.

Notice of these transactions was not given to salesmen, subcontractors, and customers of Lowell Hills, who continued to deal with Herman and Forrest as if they were the principals in the business.

The petitioners reported as long-term capital gain their respective shares of the profit on the alleged sale of their partnership interests on their 1959 returns as follows:

| Name | Long-term gain | Gain taken into account (50 percent) |
| --- | --- | --- |
| Herman and Mollie Glazer | $36,300.37 | $18,150.18 |
| Forrest B. Fleisher | 8,066.76 | 4,033.38 |
| David and Frances E. Fleisher | 4,033.37 | 2,016.68 |

All settlements on the sale of the final 24 lots and homes were effected by November 17, 1959, and a profit therefrom of $3,058.58 was reported by Levin on his Federal income tax return for 1959.

Performance under the construction contract for the period between July 21, 1959, and December 31, 1959, resulted in a profit for Herman and Forrest of $2,670.90, three-quarters of which was reported by Herman and the balance by Forrest on their respective 1959 income tax returns.

The Commissioner determined that the foregoing alleged long-term capital gains must be taxed as ordinary income.

Although section 741 of the 1954 Code concededly permits the gain on sale of a partnership interest to be treated as capital gain,[3] the Government argues here that the transaction before us was not in substance a sale of partnership interests notwithstanding that it was cast in that form, and that it was actually nothing more than an anticipatory arrangement whereby the so-called selling partners merely received their distributive shares of partnership income that should be taxed as ordinary income. Alternatively, the Government contends that even if the transaction be regarded as a true sale under section 741, the Commissioner's determination must be sustained because the proceeds received by the partners were attributable to "unrealized receivables" of the partnership under section 751 [4] and must therefore be treated as amounts "realized from the sale or exchange of property other than a capital asset." We think that both of these positions are sound.

1. It is firmly established that in applying the revenue laws, we must look to the substance of a transaction rather than to its form unless from an examination of the statute and its purpose form was

---

[3] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

[4] SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS.

(a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.—The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—

(1) unrealized receivables of the partnership, or

(2) inventory items of the partnership which have appreciated substantially in value,

shall be considered as an amount realized from the sale or exchange of property other than a capital asset.

* * * * * * *

(c) UNREALIZED RECEIVABLES.—For purposes of this subchapter, the term "unrealized receivables" includes, to the extent not previously includible in income under the method of accounting used by the partnership, any rights (contractual or otherwise) to payment for—

(1) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or

(2) services rendered, or to be rendered.

intended to be determinative. The cases giving effect to this principle are too numerous for useful cataloging here, but the following random selection will give at least some indication as to its broad scope and the wide range of its application. *Knetsch* v. *United States*, 364 U.S. 361; *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334; *Griffiths* v. *Helvering*, 308 U.S. 355; *Higgins* v. *Smith*, 308 U.S. 473; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609; *Gregory* v. *Helvering*, 293 U.S. 465. And of particular interest in this controversy are cases applying the foregoing principle in holding that a partner did not in fact sell his partnership interest so as to convert ordinary income into capital gain. E.g., *Trousdale* v. *Commissioner*, 219 F. 2d 563 (C.A. 9), affirming 16 T.C. 1056; *Haggard* v. *Wood*, 298 F. 2d 24 (C.A. 9); *Roth* v. *Commissioner*, 321 F. 2d 607 (C.A. 9), affirming 38 T.C. 171.[5]

Turning to the facts of the present case, we find that on July 21, 1959, the partnership had already built and sold 70 of the 94 houses that it had originally been organized to construct. There remained 24 houses, but all 24 were then under contracts of sale to various purchasers and were about 80 percent completed. At that point the partners went through a form of sale of their partnership interests to their attorney. The only money put up by him was a $3,000 downpayment, which is to be compared with the offsetting $3,058.58 "profit" that he derived from the transaction.[6] The attorney had no experience or training in the building construction field, and the selling partners simultaneously agreed to complete the construction of the remaining 24 houses. Legal title to the property was not transferred, although a form of trust was executed, and all proceeds from the sales of the houses were to be deposited in a bank account in the names of the selling partners. It was contemplated that, apart from the attorney's $3,000 downpayment, his remaining obligation would be met out of such proceeds. No notice of the purported sale of the partnership interests was given to salesmen, subcontractors, or customers, all of whom continued to deal with the selling partners as if they were the principals in the business. And all of the remaining 24 houses were in fact completed and the sales thereof closed within a period of about 4 months.[7]

---

[5] To be sure, these cases may have arisen under the revenue laws prior to the 1954 Code, but the principle applied, looking to the substance of the transaction, is equally applicable here.

[6] It is not clear from the record whether the $3,000 downpayment was taken into account in computing the $3,058.58 profit. But even if it were taken into account, the "profit" would appear to us to be in substance nothing more than his fee or part of his fee for arranging the transaction. Certainly, petitioners, upon whom the burden of proof rests, have not shown otherwise.

[7] The stipulated facts show that the settlement dates for 19 of the 24 houses were in August, September, or October of 1959; and the settlement dates for the other 5 houses were in November 1959.

We think that on the facts before us there was in substance no real sale of partnership interests in this case, notwithstanding the efforts of petitioners and their attorney to clothe the transaction in that form. Particularly pertinent are the oft-quoted words in *Gregory* v. *Helvering*, 293 U.S. 465, 470: "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

2. Alternatively, even if the transaction under review be regarded in substance as constituting a sale of partnership interests under section 741, petitioners are nevertheless not entitled to prevail. By its terms, section 741 explicitly removes from its operative scope the situations covered by section 751, and section 751(a) declares that—

any money * * * received by a transferor partner in exchange for * * * his interest in the partnership attributable to—

(1) unrealized receivables of the partnership * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

shall be considered as an amount realized from the sale or exchange of property other than a capital asset.

The purpose of these provisions as stated in the committee reports was "to prevent the conversion of potential ordinary income into capital gain by virtue of transfers of partnership interests." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 98; H. Rept. No. 1337, 83d Cong., 2d Sess., p. 70.

Under these provisions the money received by a selling partner to the extent attributable to unrealized receivables in respect of goods delivered, or to be delivered, is to be treated as received from the sale of property other than a capital asset. This is because the proceeds of the sale of such property by the partnership itself would be treated as the sale of property other than a capital asset; and the statute was intended to require that such proceeds retain the same character in the hands of the selling partners to the extent that the selling price of their partnership interests reflected such proceeds.

In terms of the present case the partnership was in the business of selling houses, and the sales of its houses were concededly properly classified as ordinary rather than capital transactions. Accordingly, to the extent the amounts receivable from the sales of the partnership's 24 remaining houses were reflected in the amounts receivable by the selling partners, the transaction may not be classified as a sale of a capital asset. In short, the amounts receivable from the sale of the 24 remaining houses fall within the term "unrealized receivables" in section 751, and therefore are denied capital gains treatment under section 741.

Petitioners do not contest the point that the agreements for the sales of the 24 houses were "unrealized receivables" within the meaning of section 751. But they argue that the money "attributable to"

the unrealized receivables was only $6,000 because the parties have stipulated that if the 24 remaining lots and homes had not been under agreements of sale, the sales price would have been $6,000 less. We hold that no such limitation may fairly be read into the statutory provisions, and if such limitation were to be given effect it would defeat the very purpose of the legislation.

Stated in its simplest terms, the amount "attributable to" the unrealized receivables of a partnership is that portion of the sales price received in exchange therefor. The regulations, sec. 1.751–1(c)(3), provide that in determining the amount of the sales price attributable to unrealized receivables any arm's-length agreement between buyer and seller will generally establish the amount or value. In the absence of such an agreement full account is to be taken of the estimated cost of completing performance of the contract or agreement, and of the time between the sale and the date of payment. In the present case the existence of an arm's-length agreement is questionable, but in any event it appears that the only partnership assets of value were "unrealized receivables" so that the entire purchase price must be allocated thereto. Cf. *John Winthrop Wolcott*, 39 T.C. 538.

Petitioners misconstrue the meaning of the phrase "attributable to" as used in section 751(a), in making the argument that only $6,000 was *attributable* to unrealized receivables. While it is undoubtedly true that the partnership interests were more valuable because the lots and homes were under agreements of sale, the increase in the value of the partnership is not the amount "attributable to" the unrealized receivables, under the provisions of section 751.

Had petitioners retained their partnership interests there is no question that they would have realized ordinary income upon collection of amounts receivable under the agreements of sale for the 24 lots and homes. Furthermore, had construction been completed on all the houses so that all that remained for the partners to do was to collect their money at the time of the sale of their partnership interests it is clear that the entire amounts received would be attributable to unrealized receivables. The statute was written to apply in the same manner to unrealized receivables arising out of both completed and uncompleted contracts and results should be arrived at in the same manner in both situations. Where houses are sold, although not yet completed, the cost of the lots and the cost of construction of the houses, to the extent not previously deducted as expense, would go into the basis of the unrealized receivables, and would not be totally disregarded. Sec. 1.751–1(c)(2), Income Tax Regs. Petitioners could not have disposed of anything more than bare legal title to the lots and houses since they had already been sold. The only thing of substance that petitioners had to sell was

their right to receive the income from the sales upon completion of construction. Under section 751 gains resulting from amounts received therefor are to be taxed as ordinary income. *John Winthrop Wolcott, supra.*

*Decisions will be entered for the respondent.*