MODIANO-SCHNEIDER, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Modiano-Schneider, Inc. v. Commissioner
Docket No. 822-71.
United States Tax Court
T.C. Memo 1973-5; 1973 Tax Ct. Memo LEXIS 280; 32 T.C.M. (CCH) 19; T.C.M. (RIA) 73005; January 9, 1973, Filed Neale E. Creamer, for the petitioner. Jonathan A. Brod, for the respondent. RAUM
MEMORANDUM OPINION
RAUM, Judge: The Commissioner determined a deficiency of $7,046.44 in petitioner's income tax for the taxable year ended March 31, 1967. The sole issue is whether gain realized by petitioner in the amount of $33,519.63, from a payment it received in cancellation of a land lease, constituted ordinary income or long-term capital gain. The facts have been stipulated. 2 Modiano-Schneider, Inc. ("petitioner", "Modiano-Schneider" or "the corporation"), a construction contracting firm, was incorporated under the laws of California on February 26, 1958. *281 It filed its Federal corporate income tax return for the fiscal year ending March 31, 1967 with the district director of internal revenue at Los Angeles. At the time the petition herein was filed, its principal place of business was in North Hollywood, California. Throughout its existence petitioner has used the accrual method of accounting. In 1953, Dr. Willis E. Tunnell acquired an unimproved piece of real estate in Compton, California. He wanted to construct a hospital and medical building on this property. Not having the funds available to proceed with this project, he attempted to get 100 percent financing. However, it became apparent, after he discussed his proposal with the Small Business Administration and several financial institutions, that 100 percent financing would not be available to him as an individual for this type of construction. He then sought petitioner's assistance. After discussions, petitioner proposed three methods relative to the financing and construction of the building. The method which was selected was in part as follows. Dr. Tunnell would transfer his fee interest in the land, without consideration, to the petitioner. Petitioner would obtain *282 100 percent financing, in the form of a bank loan 3 secured by a deed of trust on the property, and would build the hospital. After obtaining the loan, petitioner would transfer the land (subject to the deed of trust) back to Dr. Tunnell, who would then give petitioner a subordinated ground lease for a term of approximately eight and one-half years, starting from the completion of the building. Petitioner would then lease the hospital building to Compton Physicians & Surgeons Hospital ("the partnership"), a partnership of which Dr. Tunnell was to become a member, for a period of approximately eight and one-half years. The partnership's lease payments to the petitioner would be sufficient to cover petitioner's costs, interest expenses on the construction loan, property taxes, and profit on the over-all transaction. At the end of the period of some eight and one-half years, the land and building would belong exclusively to Dr. Tunnell, unencumbered by any obligation to petitioner or the lending institution. In accordance with this plan, on May 28, 1958 (the date of recordation), the land owned by Dr. Tunnell was conveyed by deed, without consideration, to petitioner. In *283 addition, a lease dated April 23, 1958, in respect of this land was executed between the petitioner, as lessor, and the partnership, consisting of Dr. Tunnell and four other persons, as 4 lessee. This lease provided in part as follows. Petitioner covenanted to construct a medical building and hospital upon the property. The term of the lease was eight years and one month, beginning on September 1, 1958. However, if the building was not ready for occupancy on that date, then the lease was to begin as soon as the premises were available for occupancy. The rental was to be $455,900 for the entire term of the lease, payable in equal monthly installments of $4,700. The partnership also agreed to pay any increase in real property taxes over those levied for the fiscal year 1959-60. The partnership further agreed: (1) to pay all utility charges arising in connection with its use of the premises; (2) to maintain public liability insurance which would also cover the contingent liability of the lessor; and (3) to maintain and repair the premises at its own expense. The petitioner agreed to insure the premises "against loss or damage by fire and perils enumerated in the customary, *284 standard form of extended coverage endorsement". Moreover, petitioner acknowledged the receipt, from the partnership, of prepaid rent in the amount of $31,000, to be applied as follows: (1) $4,700 for the first month of occupancy; (2) $2,800 for the month of April, 1966; and (3) $4,700 each for the months of May, June, July, 5 August and September, 1966. [1] The lease further provided that any holdover by the lessee after the expiration of the lease would create a month-to-month tenancy at $4,700 per month; that it could be assigned only with the prior written consent of the lessor; and that it was subject and subordinate to any trust deed or mortgage placed upon the premises. Should petitioner fail to make payments with respect to any such deed of trust or mortgage, the partnership was given the right to make such payments on behalf of the petitioner, and to recoup the amount paid from future rentals. Petitioner obtained *285 a $240,000 construction loan from California Federal Savings and Loan Association of Los Angeles ("the bank"), giving a note in the face amount of the loan. It was dated May 19, 1958, and was secured by a deed of trust on the land that was executed by petitioner. [2] The note was 6 guaranteed not only by two persons who appear to have been active in petitioner's affairs (Richard Modiano and Eugene S. Schneider) but also by Dr. Tunnell. It was payable as follows: $3,990 per month beginning March 1, 1959, for 46 months, with interest to be calculated during this period at the rate of 10 percent per annum, and $3,444 per month thereafter until the balance had been paid in full, with interest to be calculated at the rate of seven percent per annum. *286 The building was constructed at a cost of $235,796.06, and on March 1, 1959, it was occupied by the partnership. On October 7, 1959, the real property, subject to the foregoing deed of trust, was recoveyed without consideration by the petitioner to Dr. Tunnell. On October 23, 1959, a lease predated February 28, 1958, pursuant to a "verbal" agreement between the parties on that date, was recorded in the County Recorder's Office. In that instrument Dr. Tunnell and his wife leased the property involved to petitioner for a period of eight years and five months (101 months), beginning March 1, 1959 and ending July 31, 1967. This lease further provided in part as follows. Rent was to be $150 per year, payable on February 28, beginning with February 28, 1960. Petitioner agreed to pay all real property taxes imposed during the term of the lease (the property taxes for the fiscal year 1958-59 were to be prorated), and to maintain the property and any 7 improvements thereon in good repair. Petitioner also agreed to maintain fire insurance upon all buildings erected on the property. Should these buildings be damaged or destroyed by "fire, earthquake, or other cause" during the term *287 of the lease, petitioner was to repair the damage, making use of any insurance funds received by reason of such damage or destruction. While petitioner was given the right, with certain limitations, to refinance the deed of trust loan, all loans or encumbrances were to be liquidated at least six months prior to the termination of the lease (i.e., by February 1, 1967). This lease further provided that in the event the property should be condemned, then any damages allowed in condemnation proceedings would be divided so as to compensate Dr. Tunnell and his wife for the land, and the petitioner for the improvements thereon (limited, however, by the amount to which it would be entitled for the remainder of the term under its lease of the medical building). Upon termination of the lease, all buildings and improvements erected on the property were to become the property of Dr. Tunnell and his wife. Moreover, should the Tunnells decide to sell the property, the petitioner was to be given an option to purchase it "on the same terms and conditions any interested third party has offered and which is acceptable to Lessor". Finally, paragraph 18 of the lease provided that the Tunnells could *288 terminate the lease by paying the petitioner $4,700 for each month remaining thereunder. In the event this was done, petitioner was to "refund" to the Tunnells the interest payments remaining under the bank loan, to be calculated at the rate of seven percent per year on the unpaid principal of the loan. 8 In 1962 the partnership was reorganized; Dr Tunnell was no longer a partner. On May 31, 1962, Dr. and Mrs. Tunnell executed an "option for leases", and on the same date the Tunnells as "Lessor", and the reorganized partnership, as "Lessee", executed a new lease on the building to commence on termination of the existing lease between the partnership and the petitioner. The "option for leases" contained recitals that "* * * Modiano-Schneider, Inc., is the nominal Lessor of said demised premises under a Lease dated April 23, 1958 * * *", and that the Tunnells "* * * are now the legal and equitable owners of the above described real property". The term of the new lease was stated to be five years, beginning on October 1, 1966, [3] and terminating on September 30, 1971. Rent was to be $3,000 per month, as adjusted by certain changes in the cost of living index. The lease *289 also contained numerous other provisions, similar to those previously mentioned in relation to the earlier lease (e.g., the reorganized partnership agreed to pay all charges for utilities, to pay a sum equal to any increase of real property taxes above $2,000, to carry 9 liability insurance in stated amounts, to repair and maintain the demised premises, etc.). At some undisclosed time thereafter the reorganized partnership was negotiating *290 with Dr. Tunnell to acquire the property from him. Dr. Tunnell, therefore, approached the petitioner to discuss cancellation of the land lease. On September 7, 1965, two simultaneous lease cancellation agreements were entered into. One of these was between the Tunnells, as lessor, and petitioner, as lessee, which provided in part as follows: WHEREAS lessor has previously leased to Lessee certain real property in the City of Compton, * * * under identical duplicate leases of February 28, 1958, and February 28, 1959, [4] * * *; and WHEREAS Lessee thereafter sublet said premises to six [5] individual sublessees, under lease date April 23, 1958; and
WHEREAS Lessor, Lessee, and the above mentioned sublessees are desirous of cancelling the above mentioned leases and execute [sic] a new lease between Lessor and the above mentioned sublessees; 10 NOW THEREFORE, In consideration of the total sum of $108,100.00 paid by Lessor to Lessee, receipt of which is hereby acknowledged [6] * * * Lessor and Lessee hereby cancel the leases between them dated February 28, 1958, and February 28, 1959, and mutually release the other from all terms, covenants, conditions, and liabilities contained *291 in said leases. As of Aug. 31, 1965. [7]
*292 The other lease cancellation agreement was between petitioner, as lessor, and the five persons comprising the partnership (including Dr. Tunnell), who had signed the April 23, 1958 lease, plus a sixth person who apparently had become a member of the reorganized partnership. It was similar to the other lease cancellation agreement, set out in part above, with the exception that the consideration for this cancellation was merely "the mutual releases * * * contained [in the document]." The reorganized partnership continued to pay $4,700 a month for the eight months of September, 1965, through April, 1966, until it "finalized" an agreement with Dr. Tunnell on May 16, 1966, to acquire the property from him. 11 The Tunnells and petitioner appear to have treated the termination of the lease between them as having occurred as of the beginning of May, 1966, and they computed the amount owed by the Tunnells to petitioner as measured by $4,700 times the 15 months then remaining under the lease. That amount was $70,500, and the parties have stipulated that "On May 13, 1966, petitioner received the remaining $70,500.00 as consideration under the lease cancellation agreement". Yet *293 they also confusingly stipulated that "Of this consideration, $23,500.00 had been prepaid by the partnership in 1958 as prepaid rent". Such prepayment was applicable to the months of May through September, 1966. As already noted, the cost of constructing the medical building was $235,796.06. This cost was "amortized" by petitioner on a straight line basis over a 101 month period, and it claimed "amortization" deductions in respect of the building in the aggregate amount of $198,815.69 [8] during the period April 1, 1958 through September, 1966. 12 On its income tax return for the fiscal year ending March 31, 1967, petitioner reported long-term capital gain attributable to the cancellation of the land lease in the amount of $33,519.63. This *294 was calculated by adding the gross "sales" price ($70,500) to the amount of "amortization" which had been claimed ($198,815.69), and subtracting from this total petitioner's cost basis in the building ($235,796.06). The Commissioner's determination of deficiency was based upon reclassifying the $33,519.63 gain as ordinary income. [9]
*295 The Govermnent's position is that the lease arrangements were in effect merely an installment method of reporting petitioner's profit from the construction of the hospital, and that the "final lump sum payment merely was the final payment of 13 [such profit] * * *". It accordingly argues that such payment must be treated as ordinary income. The petitioner, on the other hand, contends that the lease arrangements were leases both in form and in substance, that the consideration which it received from Dr. Tunnell for cancellation of his lease must be treated under section 1241 of the Code [10] as an amount received in exchange therefor, and that in any event the installment method of reporting income from a construction contract is not permissible. We hold that the deficiency cannot stand. We of course agree with the Government's position that the incidence of taxation must turn upon the substance of a transaction, rather than its form, unless an examination *296 of the statute indicates that form was intended to be determinative. Commissioner v. Court Holding Co., 324 U.S. 331, 334; Higgins v. Smith, 308 U.S. 473; Griffiths v. Helvering, 308 U.S. 355; Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613; Gregory v. Helvering, 293 U.S. 465; Herman Glazer, 44 T.C. 541, 14 545-546. And it is also clear that this principle is applicable in determining whether a transaction which is cast in the form of a lease, is in substance a lease. Oesterreich v. Commissioner, 226 F. 2d 798, 801 (C.A. 9), reversing on other grounds a Memorandum Opinion of this Court. But in our view this principle is not applicable here. To be sure, the overall transaction was so structured that Dr. Tunnell would in effect obtain his 100 percent financing and petitioner in the long run would receive a net amount that would be roughly equivalent to its profit for constructing the hospital. But the point is that in order to attain these ends, the parties entered into bona fide leases which established genuine and substantial rights and liabilities between them. These leases were *297 not shams, and there is not the slightest suggestion in the record that the parties planned at the outset to have the leases terminated prematurely so as to enable ordinary income to masquerade as capital gain. If such were the case, an entirely different situation would be presented that might well call for a different result. Notwithstanding that the lease arrangements were intended as a means to enable petitioner to realize a profit on the transaction, the point is that the leases were genuine. Under the lease to petitioner, it assumed substantial obligations. Thus, in the event of damage or destruction by fire, earthquake, 15 or other cause during the term of the lease, petitioner was obliged to repair or restore the property at its own expense, regardless of whether the loss was covered in whole or in part by insurance. We can see no escape from the applicability of section 1241, and must conclude that the consideration received by petitioner for cancellation of the lease is to be considered as "received in exchange for such lease". Nor are we otherwise persuaded by the Government's contention that the lease arrangements were merely a means to enable petitioner *298 to report income on an installment basis. There is little doubt that the installment method of accounting is not available in the case of construction contracts. See section 453 of the Code, which provides for use of the installment method merely for dealers in personal property and for sales of realty and certain casual sales of personalty. The Commissioner himself has taken the position that the installment method is not available in respect of gains realized from the performance of construction contracts. Rev. Rul. 59-250, 1959-2 C.B. 134. Thus, if the point were pressed to its ultimate conclusion, petitioner would not be liable for tax on any amount in respect of this transaction for its fiscal year ending March 31, 1967, whether as ordinary income or capital gain, since it was on the accrual basis, and any income 16 chargeable to it on the construction contract would have to be regarded as accrued during its fiscal year ending March 31, 1959, when construction was completed. Accordingly, we return to our conclusion that the leases were bona fide, that the consideration received by petitioner in the year before us for cancellation of the land lease is governed *299 by section 1241, and that it must be treated as capital gain. Of course, section 1241 does not specify that the gain is capital gain; it merely states that the amount received by a lessee for cancellation of a lease shall be considered as "received in exchange for such lease". But unless petitioner were a dealer in leases or the lease in question were otherwise removed from the category of capital assets, the gain upon cancellation must necessarily be regarded as capital gain. Decision will be entered for the petitioner. Footnotes
1. Had the premises been ready for occupancy on September 1, 1958, these advance payments would have been applicable to the first month and the last six months of the lease. However, the premises were not occupied on that date, as is indicated infra. ↩
2. How petitioner was able to execute a deed of trust on May 19, 1958, in respect of the land that was not conveyed to it until May 28, 1958 [see supra, p.], was never explained in the materials before us. Moreover, the record, which was entirely, stipulated, contains a number of other instances of apparent contradiction and confusion that were not clarified by counsel. We have done our best with this exasperating situation, and to the extent that our recitation of the facts may appear to suggest inconsistencies or is otherwise obscure, we can say only that we have attempted to set forth faithfully the facts as presented to us by the parties in this unsatisfactory stipulated record. ↩
3. Although the original lease of eight years and one month (dated April 23, 1958) was to begin on September 1, 1958, and end on September 30, 1966, it was provided therein that if the premises were not ready for occupancy on September 1, 1958, the lease would commence when the premises became available for occupancy. Accordingly, since the latter date appears to have been March 1, 1959, the original lease would not terminate until March 31, 1967 - a fact obviously known by all the parties at the time of execution of the "option for leases" and the new lease in 1962. The fixing of October 1, 1966, as the date of commencement of the new lease is but another example of unexplained confusion in this record referred to in footnote 2, supra. ↩
4. The only lease between the Tunnells and petitioner introduced into evidence was dated February 28, 1958. A lease dated February 28, 1959, is mentioned only in the two lease cancellation agreements. We are wholly in the dark as to any lease dated February 28, 1959. ↩
5. The original "sublease", dated April 23, 1958, was signed by only five sublessees. Whether a sixth "sublessee" ever became a party to that instrument is not disclosed by the record. ↩
6. The recitation that $108,100 was then paid to the lessee (petitioner) does not appear to be in accordance with the facts. The lease between the Tunnells and petitioner was to terminate July 31, 1967, and by its terms the amount which the Tunnells were required to pay in the event of premature termination was to be measured by $4,700 times the number of months in the unexpired portion of the lease. Thus, if the lease were to terminate "as of August 31, 1965," there would be 23 remaining months, and $108,100 would be the appropriate amount. But as appears hereinafter, the reorganized partnership continued to pay $4,700 a month for a period of eight months after August, 1965. In determining the ultimate payment required of Dr. Tunnell, credit was given for the rent paid by the partnership during these eight months. The payment itself, as thus recomputed, was in fact made in May, 1966, as indicated hereinafter. No part of the consideration for cancellation of the lease appears to have been paid in 1965, as stated in the agreement of September 7, 1965, quoted above. ↩
7. The words "As of Aug. 31, 1965." were inserted by hand. ↩
8. The computation of this amount is unexplained, and we are unable to determine whether it is consistent with the stipulation of the parties that "amortization" was claimed "on a straight line basis over a 101-month period". Our attempts to verify this figure, on various hypotheses, have proved futile - another example of the frustrations that we encountered as a result of the manner in which this case was presented to us. ↩
9. In May of 1965 an agreement was reached between Dr. Tunnell and the Appellate Division of the Internal Revenue Service, apparently in respect of earlier years. This agreement provided that the rental payments of $4,700 per month made to petitioner under the April 23, 1958 lease between it and the partnership actually constituted taxable rental income to Dr. and Mrs. Tunnell. The Tunnells were allowed a depreciation deduction on the cost of the building, as well as deductions for interest and taxes paid.
At the time this agreement was reached, no action was taken which affected the petitioner, on the assumption by the Appellate Division that no purpose would be served by disturbing petitioner's method of reporting income. Petitioner at that time was reporting receipts as gross rents (i.e. ordinary income), and claiming deductions for amortization of cost, interest and taxes. It was the opinion of the Appellate Division that eventually, if the previously made arrangements between the parties were adhered to, the profit on the construction work would ultimately be included by petitioner as ordinary income. ↩
10. SEC. 1241. CANCELLATION OF LEASE OR DISTRIBUTORS AGREEMENT. Amounts received by a lessee for the cancellation of a lease, * * * shall be considered as amounts received in exchange for such lease * * *. ↩