VGS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6896–74, 6897–74, 9916–74.   Filed July 25, 1977.

*Jack W. Brand, Justin L. Cox,* and *William S. Painter,* for the petitioner.

*Roy S. Fischbeck,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Docket No. | Taxable year ended | Deficiency |
|---|---|---|
| 6897–74 | 7/31/66 | $120,128.27 |
| | 7/31/67 | 122,451.54 |
| | 12/31/67 | 46,129.76 |
| 6896–74 | 12/31/68 | 525,344.12 |
| 9916–74 | 12/31/69 | 177,479.59 |
| | 12/31/70 | 138,605.49 |
| | 12/31/71 | 280,445.89 |

Upon joint motion of the parties, these cases were consolidated for trial, briefing, and opinion. Concessions having been made, only the following issues remain for our consideration:

(1) Whether any part of the lump-sum purchase price paid by petitioner's predecessor in acquisition of all the capital stock of Southland Oil Co. and certain assets of the Southland Co., a partnership, is properly allocable to nondepreciable intangible assets;

(2) What was the fair market value of the Crupp Refinery at the time it was acquired; and

(3) Whether the principal purpose of the acquisition of Vermont Gas Systems, Inc., by Southland Oil Co. and its shareholders was the evasion or avoidance of Federal income tax under the provisions of section 269 of the Code.[1]

### FINDINGS OF FACT

Many of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by reference.

VGS Corp., petitioner, is a Vermont corporation and the successor to a merger between the Southland Oil Co., a Mississippi corporation, and Vermont Gas Systems, Inc., a Vermont corporation, wherein Vermont Gas Systems, Inc., was the surviving corporation. Subsequently, Vermont Gas

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

Systems changed its name to VGS Corp. At the time of filing its petitions herein, petitioner's principal office was located in Yazoo City, Miss.

Southland Oil Co. filed corporation income tax returns for the taxable years ended July 31, 1966, July 31, 1967, and December 31, 1967, with the District Director of Internal Revenue, Jackson, Miss. Vermont Gas Systems, Inc., filed its corporation income tax returns for the taxable years 1966 and 1967 with the District Director of Internal Revenue, Burlington, Vt. Vermont Gas Systems, Inc., filed corporate income tax returns for the taxable years 1968 and 1969 with the Internal Revenue Southeast Service Center, Chamblee, Ga. VGS Corp. filed corporation income tax returns for the taxable years 1970 and 1971 with the Internal Revenue Southeast Service Center, Chamblee, Ga.

Prior to July 31, 1965, the Southland Co. was a partnership composed of Mr. E. Constantin, Jr., Mr. Gilbert L. Bright, and Mr. Charles W. Else, whose ownership interests therein were 90 percent, 5 percent, and 5 percent, respectively. The partnership owned and operated the Rogerslacy Refinery located in Sandersville, Miss., from which petroleum products, principally asphalt, were refined and marketed. In addition to the refinery at Sandersville, Miss., the partnership owned a terminal at Vicksburg, Miss., several bulk plants, service stations, miscellaneous transport equipment and automobiles, timberland in Mississippi, and 90 percent of the stock of Delta Refining Co. of Memphis, Tenn. Delta Refining Co. owned a large refinery located in Memphis, Tenn. Prior to July 31, 1965, the Southland Oil Co. (Old Southland) was a Mississippi corporation, the stock of which was owned by Mr. Constantin, Mr. Else, and Mr. Bright in the amounts of 90 percent, 5 percent, and 5 percent, respectively. Old Southland owned and operated the Crupp Refinery at Yazoo City, Miss., which produced asphalt as its principal product. In addition to other minor assets, Old Southland owned a pipeline from a gas plant located near Laurel, Miss., to the Rogerslacy Refinery.

In 1964 Mr. Constantin decided to sell Old Southland and the assets of the Southland Co. partnership (hereinafter sometimes referred to collectively as the Southland companies) in order to diversify his holdings and thereby reduce his business and investment risk. His decision to sell was based

primarily on his desire to reduce his executive responsibilities in light of his advanced age. Mr. Constantin, whose net worth was approximately $6 million, was the principal officer of the Southland companies and actively participated in their day-to-day operations.

After Mr. Constantin decided to sell the Southland companies he directed Mr. Paul A. Lockhart, Jr., his attorney and personal adviser, to contact prospective buyers. Mr. Lockhart approached several prospective purchasers and discussed in general terms the proposed sale of the companies including the Delta Refinery operation. However, after preliminary negotiations, each prospective buyer either declined to make an offer or offered to buy the companies for little or no downpayment and extended installment terms. In the spring of 1965, Mr. Lockhart approached Mr. G. Scott Hammonds, a geologist and independent oil operator, with regard to the possible purchase of the Southland companies. Based on their conversations, Mr. Hammonds considered making the purchase. On April 23, 1965, Mr. Hammonds retained the firm of Purvin & Gertz, Consulting Engineers of Dallas, Tex., to conduct a study of the Southland Co. partnership and Old Southland. The results of this study were set forth in the firm's report entitled "Review of Operations, The Southland Company and Affiliated Companies." Specifically, Mr. Hammonds requested that Purvin & Gertz forecast the future profitability and cash flow of the Southland operations and ascertain the physical value of the fixed assets of the companies.

In the latter part of April 1965, Purvin & Gertz initiated their study of the Southland companies. Mr. Melvin H. Gertz was in overall charge of the study. He was assisted by Mr. John P. Marshall and Mr. James L. Walker. Purvin & Gertz had performed services for Mr. Constantin with regard to his business operations since 1950. Two of the engineers involved in the Hammonds' study, Mr. Gertz and Mr. Walker, had performed services for Purvin & Gertz on prior occasions involving the Southland companies and were generally familiar with the companies' assets and operations. Mr. Gertz is an expert in the appraisal and evaluation of refining facilities. Mr. Walker is an expert in projecting the profitability and cash flow of refining facilities. Mr. Marshall, now

deceased, was an evaluation engineer specializing in the physical appraisal of refineries and natural gas and oil processing properties.

In the Purvin & Gertz study, Mr. Marshall's function was to ascertain the replacement cost for new physical properties and then apply a judgment depreciation factor to this value to arrive at the physical or fair market value of the physical (depreciable) properties. Mr. Walker's primary function was to investigate the operations of the Southland companies and forecast the future profitability of the operations and prepare a 10-year forward cash flow projection. Mr. Gertz's function was to supervise the overall direction of the study, coordinate the team members, and help edit the final report. Mr. Marshall's appraisal of the physical assets was to be used to establish a depreciable base for the depreciable assets in order to ascertain the allowable deduction for depreciation under the Federal tax laws. This was necessary to enable Mr. Walker to ascertain the approximate Federal income tax liability of the operations and thereby accurately predict the net cash flow of the companies. This type of study and the procedures employed therein had been conducted by Purvin & Gertz for other companies on numerous occasions prior to the Hammonds' study.

In order to develop the appraised fair market values of the physical assets, Marshall first inventoried all existing assets. In making his inventory of the physical assets, Mr. Marshall utilized a full inventory or "nuts and bolts" appraisal prepared in 1957 by Mr. E. D. Martin, an evaluation engineer. From the Martin inventory Mr. Marshall deleted facilities no longer in operation and included new facilities added to the companies' plants since 1957. Mr. Marshall's valuation figures were not dependent upon the valuation figures in the Martin report. But rather, after ascertaining physical assets actually present in the Southland companies in 1965, Mr. Marshall, using various construction costs indices, calculated a total replacement cost of $7,771,535 for the Southland companies' assets as of March 1, 1965.

Mr. Marshall made onsite inspections of the major physical facilities of the Southland companies and some of the service station facilities. Based on his observations of the facilities, Mr. Marshall arrived at a "judgment depreciation" factor for

each group of physical assets. The depreciation factors arrived at by Mr. Marshall were based on the age of the equipment, its general condition and utilization in terms of present and future uses, and its obsolescence. Mr. Marshall's depreciation factors represented his calculation and judgment of actual wear and tear on the assets and were not derived from or based on book or accounting depreciation figures. The "judgment depreciation" factor for each group of physical assets was then applied to the replacement cost figure for each group of assets to arrive at the present value or the fair market value of the physical properties. By following this procedure, Mr. Marshall calculated the present or fair market value of the physical assets of the Southland companies to be $4,268,800 as of March 1, 1965. Of this amount, $3,988,800 was attributable to the depreciable physical assets of the combined Southland companies.

Because Mr. Marshall assumed the degree of possible error in the appraised values to be plus or minus 10 percent, Mr. Hammonds directed Purvin & Gertz to use a total valuation figure for the depreciable assets of $3,500,000 in the study, rather than the $3,988,000. In accordance with Mr. Hammonds' directions, for purposes of the Purvin & Gertz report, the appraised values of the depreciable physical assets were reduced on a pro rata basis to reflect the possible error of plus or minus 10 percent. The appraised values of the depreciable physical assets and the values as reduced to reflect the possible error factor which were used in the Purvin & Gertz report are as follows:

| Asset | 3/1/65 appraised present value | Reduction factor | Minimum present value |
|---|---|---|---|
| Southland Oil: | | | |
| Crupp: Operating | $1,137,100 | 3.5/3.9888 | $997,756 |
| Not in use | 36,200 | 3.5/3.9888 | 31,764 |
| Selling equipment | 5,700 | 3.5/3.9888 | 5,002 |
| Southland: | | | |
| Rogerslacy | 1,446,700 | 3.5/3.9888 | 1,269,417 |
| Vicksburg Terminal | 175,900 | 3.5/3.9888 | 154,345 |
| Bulk plants | 102,300 | 3.5/3.9888 | 89,764 |
| Service stations | 279,900 | 3.5/3.9888 | 245,600 |
| Company SS equipment | 20,100 | 3.5/3.9888 | 17,637 |
| Dealer SS equipment | 175,500 | 3.5/3.9888 | 153,994 |
| Loan equipment | 12,900 | 3.5/3.9888 | 11,319 |
| Transports | 75,600 | 3.5/3.9888 | 66,336 |

| Autos and trucks | 48,300 | 3.5/3.9888 | 42,381 |
|---|---|---|---|
| Oil field service | 13,500 | 3.5/3.9888 | 11,846 |
| Refinery wholesale | 388,000 | 3.5/3.9888 | 340,453 |
| Miscellaneous | 71,100 | 3.5/3.9888 | 62,386 |
| Total | 3,988,800 | | 3,500,000 |

The appraised values of the fixed assets of the Southland companies as shown in the Purvin & Gertz report were not dependent upon the past or projected earnings of the Southland companies or any other intangible factor. The preparers of that report were confident that a "nuts and bolts" appraisal would corroborate and in fact support values in excess of those shown therein.

Utilizing these appraised values as the depreciable base and taking into account crude oil supply, markets, product prices, and other intangible factors, Mr. Walker estimated the future profitability of the Southland companies and developed a 10-year forward cash flow projection.

Using the Purvin & Gertz report, Mr. Hammonds sought to arrange long-term financing for the acquisition of the Southland companies. However, various lenders contacted required substantial security for the proposed loans in addition to the assets of the companies to be acquired; therefore, Mr. Hammonds was unwilling to purchase the properties.

Shortly after the preparation of the Purvin & Gertz report, Mr. Robert M. Hearin of Jackson, Miss., became aware of the existence of that report and Mr. Constantin's desire to sell the Southland properties. At that time, Mr. Hearin was president of First National Bank of Jackson, Jackson, Miss., and in that capacity lent money to the Southland companies on several occasions. Mr. Hearin was familiar with the physical state of the Southland properties and the Southland operations and, as their banker, was generally aware of the Southland companies' financial figures.

Mr. Hearin and Mr. Constantin entered into negotiations for the sale of Old Southland and the sale of most of the assets of the Southland Co. partnership. Although Mr. Hearin wanted to purchase the Southland companies and keep them in Mississippi he was, nevertheless, under no compulsion to do so.

Mr. Hearin and Mr. Constantin agreed upon a purchase price for most of the properties of the Southland Co.

partnership and all of the stock of Old Southland in the amount of $3,725,000 plus the net value of the current assets over the liabilities as of July 31, 1965, the date of the sale. The $3,725,000 portion of the purchase price was based upon and equal to the minimum appraised values of the depreciable physical assets as shown in the Purvin & Gertz report, as adjusted for certain minor deletions due to assets valued and not sold and additions for assets sold and not listed in the report. Of the $3,725,000 which was negotiated and bargained for and, in fact, paid for the assets of the Southland companies (based primarily on the appraised physical or fair market values of the physical assets as stated in the Purvin & Gertz report), $1,059,129 was paid for the stock of Old Southland and $2,665,871 for the assets of the Southland Co. partnership which were sold. The balance of the net purchase price was $3,634,683.51 of which $492,487.46 was allocable to Old Southland as the value of its net current assets as of July 31, 1965, and $3,142,196.05 was allocable to the Southland Co. partnership as the value of its net current assets as of July 31, 1965. In addition, the purchasers were to assume liabilities in the amount of $2,231,325.77. Of this amount, $224,937.99 represented the liabilities of Old Southland and $2,006,387.78 represented the liabilities of the Southland Co. partnership.

During the negotiations between Mr. Constantin and Mr. Hearin, no mention was made nor any discussion had of going-concern value, goodwill value, or any other intangible value. The sellers were aware, prior to the sale, that a price based solely on the appraised values of the physical assets and the value of the net current assets would result in ordinary income due to the recapture of depreciation rather than long-term capital gain attributable to the sale of goodwill or other intangibles; they, nonetheless, allocated the purchase price on their partnership income tax return in the same manner as agreed upon in the sale. Recapture of depreciation due to the sale of the Southland companies resulted in $234,394.71 of ordinary income to the sellers.

On July 30, 1965, Old Southland changed its name to the B.E.C. Corp. On July 30, 1965, a new corporation was organized under the name of Southland Oil Co. (New

Southland). Its authorized capital consisted of 5,000 shares of common stock with a par value of $10 each, issued as follows:

| Registered owner | Number of shares |
|---|---|
| Robert M. Hearin | 3,250 |
| Annie Laura S. Hearin, as custodian for Robert M. Hearin, Jr., under the Mississippi Uniform Gifts to Minors Act | 750 |
| Charles W. Else | 400 |
| Paul A. Lockhard, Jr. | 200 |
| Doris M. Brooks | 200 |
| F. A. Story | 100 |
| J. C. Porter | 100 |
| Total | 5,000 |

On August 2, 1965, New Southland purchased all of the outstanding stock of B.E.C. Corp. (Old Southland) for $1,551,616.46. The purchase price was satisfied by four term notes payable to Mr. Constantin, the Constantin Foundation, Mr. Gilbert L. Bright, and Mr. Charles W. Else and four promissory notes payable to Mr. Constantin, the Constantin Foundation, Mr. Bright, and Mr. Else.

On August 5, 1965, the Board of Directors of New Southland voted to liquidate the B.E.C. Corp. and distribute its assets to the parent corporation. B.E.C. Corp. was then liquidated and its assets were distributed to New Southland, which took an adjusted basis in those assets equal to the purchase price of the stock of B.E.C. Corp. ($1,551,616.46) plus the liabilities of B.E.C. Corp. assumed in the liquidation of $224,937.99 or $1,776,554.45.

The adjusted basis was allocated by New Southland among the assets it received in the same manner as agreed upon in the sale; that is, $1,059,129 to the tangible assets and $717,425.45 to the current assets. The book value of the assets as reflected on the books of B.E.C. Corp. and the purchase price attributed to the assets by the purchaser, New Southland, were as follows:

| | Basis to B.E.C. | Purchase price attributed | Difference |
|---|---|---|---|
| Total current assets | $717,425.45 | $717,425.45 | 0 |
| Fixed assets: | | | |
| Service station rental property | 2,518.00 | 2,518.00 | 0 |
| Crupp Refinery | 209,587.33 | 997,756.00 | $788,168.67 |
| Selling equipment | 6,430.05 | 5,002.00 | (1,428.05) |
| Gas pipeline | 53,429.56 | 53,853.00 | 423.44 |
| Total fixed assets | 271,964.94 | 1,059,129.00 | 787,164.06 |
| Total current assets and fixed assets | 989,390.39 | 1,776,554.45 | 787,164.06 |

On August 2, 1965, New Southland also purchased assets of the Southland Co. partnership for $5,808,067.05 and assumed liabilities of the partnership in the amount of $2,006,387.78. The $5,808,067.05 purchase price was satisfied by three term notes and three promissory notes all of which were payable to the Southland Co. After the sale the Southland Co. continued to operate as a partnership for a number of years.

The tangible assets sold to New Southland by the Southland Co. partnership were as follows:

| | | |
|---|---:|---:|
| Rogerslacy Refinery (Laurel) | | [1]$1,209,417 |
| Terminal—Vicksburg (total value $154,345) ½ only | | 77,172 |
| Bulk plants (6) | | 89,764 |
| Service stations (exclusive of land) | | 245,600 |
| Company service station equipment | | 17,637 |
| Dealer service station equipment | | 153,994 |
| Loan equipment | | 11,319 |
| Transports (per Gertz Report) | $66,336 | |
| June addition | 102,450 | 168,786 |
| Autos and trucks | | 42,381 |
| Oil field service | | 11,846 |
| Refinery wholesale | | 340,453 |
| Miscellaneous | | 62,386 |
| Stock of Yazoo Industrial and Miss. Business | | 1,500 |
| Total depreciable properties | | 2,492,255 |
| Land value (Southland Co. only) | | 173,616 |
| Total fixed assets | | 2,665,871 |

---

[1] The actual figure allocable to the refinery is $1,269,417; the difference of $60,000 is attributable to a typographical error and this amount is accounted for in the total.

With the exception of the June 1965 addition to the transports of $102,450, the values listed for the depreciable assets were exactly the same as shown in the Purvin & Gertz report.

The basis for depreciation used by New Southland for the assets received was equal to the price paid for the assets plus the liabilities assumed. The book values of the assets reflected on the books of the Southland Co. partnership and the purchase price attributed to the assets by New Southland, were as follows:

| Asset | Basis to the Southland Co. | Purchase price attributed | Difference |
|---|---:|---:|---:|
| Cash | $120,837.97 | $120,837.97 | 0 |
| Notes, accounts and claims receivable | 3,803,127.87 | 3,803,127.87 | 0 |
| Exchange account—crude oil | 30,705.00 | 30,705.00 | 0 |

| | | | |
|---|---|---|---|
| Inventories | 1,146,289.50 | 1,146,289.50 | 0 |
| Prepaid and deferred charges | 46,226.35 | 46,226.35 | 0 |
| Unamortized investment | 1,397.14 | 1,397.14 | 0 |
| Total current assets | 5,148,583.83 | 5,148,583.83 | 0 |
| Rogerslacy Refinery | 404,167.96 | 1,269,417.00 | $865,249.04 |
| Vicksburg Terminal ½ interest | 46,387.21 | 77,172.00 | 30,784.79 |
| Service stations | 129,446.53 | 263,237.00 | 133,790.47 |
| Contract dealers equipment | 128,915.52 | 153,994.00 | 25,078.48 |
| Loan equipment | 5,955.98 | 11,319.00 | 5,363.02 |
| Transports | 164,621.20 | 168,786.00 | 4,164.80 |
| Six bulk plants | 139,360.49 | 89,764.00 | (49,596.49) |
| Automobiles and trucks | 56,523.36 | 42,381.00 | (14,142.36) |
| Oil field sales and service | 12,153.34 | 11,846.00 | (307.34) |
| Refinery wholesale department | 432,004.08 | 340,453.00 | (91,551.08) |
| Land | 274,973.24 | 173,616.00 | (101,357.24) |
| Miscellaneous | 13,425.26 | 62,386.00 | 48,960.74 |
| Equipment work in process | 2,678.49 | 0 | (2,678.49) |
| Total fixed assets and land | 1,810,612.66 | 2,664,371.00 | 853,758.34 |
| Stock—Yazoo Co. Industrial Dev. Corp | 1,000.00 | 1,000.00 | 0 |
| Stock—Miss. Business Industrial Dev. Corp | 500.00 | 500.00 | 0 |
| Total stocks | 1,500.00 | 1,500.00 | 0 |
| Grand total | 6,960,696.49 | 7,814,454.83 | 853,758.34 |

During the early 1960's and at the time of the sale, the small refinery business was highly competitive and extremely risky. Generally, small refineries, such as those owned by the Southland companies, were economically unsound in that they could not compete with the larger, integrated refining operations. Many of these smaller refining companies were in severe financial difficulty. As of 1965 the Southland companies, mainly because they were asphalt specialty refineries, were able to earn a profit. The profits of the Southland companies were sufficient to justify an investment in the physical assets of the companies at the minimum appraised values but, in the opinion of Purvin & Gertz, the return was insufficient to ascribe any value to intangibles. The Purvin & Gertz report projected an increase in the earnings of the Southland companies based on increased throughput from 7,600 barrels per day to 10,200 barrels per day. The increased throughput could be achieved only by investing additional capital in the companies amounting to $60,000 per year over a 10-year period. The profitability of the Southland companies as projected would provide a normal return on the investment in the fixed and current assets at their fair market values as of July 31, 1965.

Both the Rogerslacy Refinery and the Crupp Refinery relied substantially on the Heidelburg, Encutta, and Yellow Creek fields in Mississippi for their source of crude oil. These fields produced the heavy asphaltic crude necessary for the production of asphalt. As of 1965 the Southland companies had one long-term crude supply contract. Under that contract the price was the same as the posted field price, and at that time and for the foreseeable future the available supply of crude oil was plentiful; thus, little competitive advantage was gained from the supply contract.

The personnel of the Southland companies, for the most part, were expected to remain with the operations after the sale. However, Mr. Constantin, who was the principal officer of the companies and, in fact, ran the companies on a day-to-day basis, would no longer be associated with the Southland operations after the sale.

From the late 1950's until 1973 there was continual pressure exerted on the domestic refining industry in the United States due to the importation of very low cost foreign crude oil. In response to this pressure a mandatory oil import quota program was instituted in order to equalize crude oil costs for all refineries, large and small. Under this program, refineries, including Southland, were granted an allowance or credit against the cost of domestic crude oil thus enabling them to share the benefits of low cost imported crude oil even though the refinery did not physically have access to the imported oil. The result was a relative reduction in the cost of crude oil for all refineries. The mandatory import quota was earned on a monthly basis and the program was renewable every 6 months, but there was no assurance of continuation of the program beyond any one '6-month period. The mandatory oil import quota of each refinery was nontransferable and applied to each on the basis of its throughput. The quota was an integral part of the operations of every domestic refinery in the United States and, in the case of smaller refineries, often enabled them to stay in business. Smaller refineries generally had higher production costs and were less economical than the larger ones, and the program allowed them a credit based on a higher percentage of their throughput. Therefore, the mandatory oil import quota program was such that there was no real competitive advantage or benefit

gained by one refinery over another because of the existence of the program.

The Southland companies produced as their principal products asphalt and asphalt emulsions, diesel fuel, and fuel oils. The asphalt market served by the Southland companies at the time of the sale was highly competitive. The Southland companies had at least seven major competitors located in adjacent States that actively sought the Mississippi market. The Southland companies had no long-term contracts for the sale of asphalt and all sales were either made pursuant to public bids or were negotiated on a job-by-job basis. The Southland companies had a large customer, the Atlas Roofing Co. located in Meridian, Miss. This customer accounted for approximately 20 percent of Southland's total output. Because of the availability of competitive materials and freight distances, when the Southland companies were sold it was contemplated that this business would continue. Retail sales of Southland products made through company-contracted outlets were competitive; therefore, there was little name brand identification with Southland products. The Southland companies also sold aviation fuel to airbases in Mississippi and Alabama under the small business set-aside provision, which is designed to enable a small refiner to get some of this business. However, little competitive advantage is actually gained because fuel must be sold at the competitive price set by the large refineries. The major refineries have the capability of bidding the price so low that a small refinery may be unable to exercise its option to supply the fuel.

Among the assets of Old Southland when its stock was acquired by Mr. Hearin was the Crupp Refinery. It was located on land in Yazoo City, Miss., which had been leased by Mr. J. Herbert Hogue to Paluxy Asphalt Co. On December 31, 1964, Paluxy Asphalt Co. was merged into Old Southland. The lease, entered into on February 14, 1941, had a term of 15 years and an option to renew for a like period. The Crupp Refinery was located in Makins, Tex., before it was dismantled and moved to Yazoo City.

The lease was renewed for 15 years on October 24, 1955, but in the late 1950's a lawsuit was instituted between the Hogue family and Paluxy Asphalt Co. over the termination provisions of the lease, the Hogues contending that the refinery

had been abandoned and the leased premises should revert to them. Paluxy prevailed in the action ultimately decided by the Mississippi Supreme Court but the lawsuit generated considerable friction between Mr. Hogue and Mr. Constantin. The personal animosity of Mr. Hogue for Mr. Constantin did not extend to the employees of Southland but it appeared unlikely that Mr. Hogue would agree to a second renewal of the lease when it was due to expire on February 14, 1971. Mr. Charles Else, who at that time was a resident of Yazoo City, Miss., was on relatively good terms with Mr. Hogue, who recognized him as an employee of the company rather than the principal owner and operator of the refinery.

Mr. Hearin, prior to his negotiations with Mr. Constantin for the purchase of the Southland companies, was well aware of the lease termination provision. Both Mr. Hearin and Mr. Else felt that they would have little problem in renewing the lease after the departure of Mr. Constantin. This was, therefore, the feeling in which the parties conducted their negotiations for the purchase of Old Southland which included the Crupp Refinery facility.

After the sale of the Southland companies in 1965 Mr. Constantin ceased to be associated with the refinery and Mr. Else was put in complete charge of New Southland. After the sale New Southland made no attempt to negotiate a new lease believing that a cooling-off period would allow the animosity existing between the parties to wane and allow the successful negotiation of a new lease. On October 2, 1970, the lease was renewed by the new management with the aid of the citizens of Yazoo City, Miss. Under the extension either party could terminate by written notice not less than 6 months prior to termination, but no notice could be given requiring termination earlier than June 30, 1972. Upon termination New Southland would have 6 months to remove its improvements.

Purvin & Gertz, in the latter part of April 1965, as part of the appraisal of the Southland companies, appraised the physical assets of Old Southland, which included the Crupp Refinery. Mr. John P. Marshall, now deceased, an evaluation engineer with Purvin & Gertz specializing in the physical appraisal of refineries and natural gas and oil processing properties prepared the appraisal of the physical assets. Mr. Marshall, using a replacement cost method, determined the

replacement cost of the Crupp Refinery to be $2,274,219. He also conducted extensive onsite inspections of the Crupp Refinery and had full knowledge of the termination date of the leasehold upon which the refinery was situated. His valuation was based on the belief that the lease would be renewed. Based on his observations of the Crupp Refinery, considerations of the age of the refinery, its utilization in terms of present and future uses, and its general condition and obsolescence, Mr. Marshall determined a depreciation factor for the Crupp Refinery of 50 percent. This depreciation factor represented Mr. Marshall's estimate of the actual wear and tear on the refinery and was not derived from or based on book or accounting depreciation figures. Applying this factor, Mr. Marshall valued the Crupp Refinery at $1,137,100 as of March 1, 1965. He then applied an error factor of plus or minus 10 percent and arrived at a minimum appraised value of the Crupp Refinery shown in the Purvin & Gertz report as of March 1, 1965, of $997,756.

Subsequent to the preparation of the Purvin & Gertz report, negotiations for the sale of the stock of Old Southland were entered into between Mr. Constantin and Mr. Hearin. The stockholders of Old Southland were unwilling to make any price concession for the refinery below the figure shown in the Purvin & Gertz report simply because the refinery was located on leased property and the buyers were unconcerned by the termination provision in the lease. Thus, during the course of the negotiations the parties agreed to assign a value of $997,756 to the Crupp Refinery, as an asset of Old Southland.

Although the Crupp Refinery was a relatively old refinery, as of June 7, 1966, it was in good working condition due, in part, to the fact that various worn out parts over the years had been replaced.

In February 1963 the Vermont Public Service Board commissioned Commonwealth Services, Inc., to study and evaluate the feasibility of establishing a natural gas distribution system for northern Vermont. At that time Vermont was the only State in the continental United States without a natural gas distribution system. Mr. Cecil Inman, Jr., a Jackson, Miss., bond dealer and owner of Southern Bond Co., was actively engaged in the financing of natural gas

distribution systems. Sometime in 1963, Mr. Inman, cognizant that Vermont did not have a natural gas distribution system, appeared before the Vermont Public Service Board in connection with acquiring the right to construct a pipeline to provide a natural gas distribution system for the State of Vermont.

On January 2, 1964, Vermont Gas Systems, Inc. (VGS), was organized and incorporated under the laws of the State of Vermont with an authorized capital of 6,000 shares of no-par-value common stock to be sold at $200 per share. The incorporators were John A. Calhoun, a Vermont attorney, Donald G. Martin, a Vermont surveyor, and William R. Carter, a building contractor of Fayetteville, Tenn. Initially, 304 shares of VGS were issued as follows:

| Shareholder | Address | Number of shares |
|---|---|---|
| Southern Bond Co | Jackson, Miss. | 97 |
| Cecil Inman, Jr. | Jackson, Miss. | 42 |
| William R. Carter | Fayetteville, Tenn. | 55 |
| Hale E. Roberts | Brookhaven, Miss. | 34 |
| Firstco, Inc | Jackson, Miss. | 33 |
| Lamar Life Ins. Co. | Jackson, Miss. | 32 |
| Lamar Beacham | Jackson, Miss. | 4 |
| Thomas Wright | Jackson, Miss. | 1 |
| William H. Mounger | Jackson, Miss. | 1 |
| W. Calvin Wells | Jackson, Miss. | 1 |
| James Raulston | Jackson, Miss. | 1 |
| John D. Paterson | Vermont | 1 |
| Douglas G. Martin | Vermont | 1 |
| John A. Calhoun | Vermont | 1 |
| Total | | 304 |

Mr. John D. Paterson, a Vermont attorney and a former chairman of the Vermont Public Service Board, was the first president of VGS.

On March 10, 1964, the board of directors of VGS retained Commonwealth Services, Inc., to reevaluate the prior feasibility study prepared for the Vermont Public Service Board. On November 27, 1964, Commonwealth issued a report indicating it was both economically and technologically feasible to deliver natural gas received at the Canadian border to markets in the greater Burlington area in Vermont. In its financial projections Commonwealth estimated that all construction and expansion, with the exception of temporary bank loans to be repaid by 1967, could be financed from

operating cash flow, equity, and long-term debt. Total long-term financing was estimated at $3,721,800. Commonwealth forecast that a net profit could be expected by 1967 at which time there would be cash generated after operating expenses of $647,411.

On October 21, 1964, VGS entered into an agreement with Trans-Canada Pipelines, Ltd., of Toronto, Canada, a Canadian natural gas transmission company, to supply natural gas. On February 16, 1966, the agreement was formalized in a written contract in which VGS agreed to a 25-year take-or-pay provision for supplies of natural gas at set demand and commodity prices beginning in November 1966. The total minimum commitment on the contract by VGS was approximately $57 million over the 25-year period. Under the contract Trans-Canada agreed to extend its pipeline to the Canadian border.

Initially, all financing for VGS was accomplished through the sale of capital stock and a loan in the amount of $500,000 from the Northern Trust Co. of Chicago, Ill. As of December 31, 1964, additional shares of capital stock of VGS had been issued so that the capital account totaled $421,800 and the total number of shares outstanding was 2,109. Despite the additional capital contributed by the shareholders, it became increasingly apparent that principals were either unable or unwilling to contribute additional necessary equity to finance the operations of the company. Moreover, additional equity was required under an agreement with Northern Trust Co. whereby Northern Trust Co. was to provide a $2 million loan to finance the pipeline construction. In early 1965 Mr. Hearing was consulted by Mr. Inman with regard to possible additional sources of equity financing for VGS. Mr. Hearin, then president of First National Bank of Jackson, Jackson, Miss., had on previous occasions made loans to some of the Mississippi principals to finance their equity interests in VGS. Prior to his employment with First National Bank Mr. Hearin worked for United Gas Pipeline Co. as manager of the pipeline company and its producing operations in Mississippi and, although Mr. Hearin became a banker, he continued to be involved with the oil and gas business. He had also owned a small private gas company in Cortez, Colo., that had been very profitable.

In response to Mr. Inman's inquiry, Mr. Hearin contacted Carl M. Loeb, Rhoades, Inc. (Rhoades), a New York brokerage house, to seek assistance in obtaining additional long-range financing for VGS. In August 1965 Rhoades completed a feasibility study of investing in VGS. The study relied heavily on the Commonwealth report and recommended investment in VGS. Based on the study, VGS on October 15, 1965, issued an additional 2,891 shares of capital stock of which 2,333 went to Rhoades and 558 went to the other shareholders. Thus, 5,000 shares were then outstanding representing shareholder investment of $1 million. In addition, Rhoades arranged a loan with Irving Trust Co. of New York in the amount of $2,500,000 representing a refinancing of the $500,000 loan with Northern Trust Co. and additional financing of $2 million. The loan was at 6-percent interest and matured September 30, 1966. However, even after the infusion of capital, the financial condition of VGS remained poor.

In the fall of 1965 VGS applied for and was granted permits from the Federal Power Commission to import natural gas and from the President of the United States to maintain facilities at the Vermont-Canadian border. At that time Trans-Canada applied for and obtained a permit from the Canadian Natural Energy Board to export natural gas.

Initially, Mr. Hearin was primarily interested in the operations of VGS because the bank of which he was president had made loans to several persons to finance their participation in the company. As the financial requirements of VGS increased Mr. Hearin became more interested and more involved.

On October 6, 1966, 1 share of VGS capital stock was transferred from Mr. Thomas L. Wright to Mr. Hearin and on October 7, 1966, at a special meeting of the stockholders of VGS, Mr. Hearin represented by proxy 90 percent of the shareholders of VGS. The proxies, represented by powers of attorney, were all from Mississippi shareholders and Carl M. Loeb, Rhoades, Inc. During the meeting Mr. Hearin was elected a director to fill Mr. Wright's place. Also, at that time convertible debentures in the amount of $1 million were authorized to be issued.

On November 15, 1966, VGS issued $600,000 of 6-percent convertible debentures maturing in 1976 to the following:

| Holder | Address | Amount |
|---|---|---|
| Lamar Life Ins. Co. ................. | Jackson, Miss. | $72,000 |
| Firstco, Inc. ............................... | Jackson, Miss. | 68,000 |
| William R. Carter .................... | Fayetteville, Tenn. | 113,000 |
| Thomas L. Wright ................... | Jackson, Miss. | 46,000 |
| Cecil Inman, Jr. ....................... | Jackson, Miss. | 83,000 |
| James W. Newman III ............ | Jackson, Miss. | 8,000 |
| Robert M. Hearin .................... | Jackson, Miss. | 140,000 |
| Carl M. Loeb, Rhoades, Inc.... | New York, N.Y. | 70,000 |

In February 1967 additional 6-percent convertible debentures were issued in the amount of $200,000 to the following:

| Holder | Address | Amount |
|---|---|---|
| Lamar Life Ins. Co. ................. | Jackson, Miss. | $29,000 |
| Firstco, Inc. ............................... | Jackson, Miss. | 26,000 |
| William R. Carter .................... | Fayetteville, Tenn. | 42,000 |
| Cecil Inman, Jr. ....................... | Jackson, Miss. | 30,000 |
| James W. Newman III ............ | Jackson, Miss. | 3,000 |
| Carl M. Loeb, Rhoades, Inc.... | New York, N.Y. | 70,000 |

In early 1967 VGS was having difficulty acquiring the necessary capital to expand its operations to meet its contractual obligations and to make the system profitable. Representatives of Rhoades, in early 1967, approached Mr. L. Julian Gaissert of R.A. Ransom Co., Inc., an engineering consulting firm, to undertake a survey of the operations of VGS.

In the spring of 1967 Gaissert concluded several studies of the operations of VGS. The studies were based upon differing assumptions concerning methods of purchasing natural gas, methods of financing, and methods of developing the system. The purpose of the various studies was to determine what could be done to improve the financial condition and make the company a viable concern. After having completed the studies, Mr. Gaissert concluded that the company's financial difficulties stemmed from a number of specific problems and that proper resolution of these problems would enable the company to earn a profit by 1969 or 1970.

Mr. Gaissert concluded that if VGS were to overcome its financial difficulties it must renegotiate the contract for the

supply of natural gas with Trans-Canada because the contract in effect was too burdensome; he also concluded that the company needed to obtain additional financial help to expand its operations, increase its rate of growth, and thus attract new customers and reduce its operating expenses.

The contract with Trans-Canada called for increasing contract demands through the contract year 1972–73. As the contract demands increased, so did the minimum amount VGS had to pay each year under the minimum take-or-pay provision of the contract. This resulted in a severe financial burden on the company in its early years. Mr. Gaissert also concluded that the Commonwealth report had placed too much emphasis on the company's ability to sell natural gas to industrial and commercial customers. Instead, Mr. Gaissert concluded that it would be necessary to concentrate on the sale of natural gas to residential customers; this required significant expansion of the distribution system at an additional cost of from $3 million to $5 million.

The operational difficulties of the company could, in part, be traced to the fact that the individuals managing its operations had little or no working knowledge of gas pipeline operations. Mr. Hearin and Mr. Else, the principal controlling shareholders of New Southland at that time, were aware of the Gaissert study and agreed with its conclusions. After Mr. Gaissert concluded his studies, it became clear that the principal shareholders of VGS did not have the financial resources to turn the company into a profitable operation. Thus, about June 1967 Mr. Hearin approached Mr. Else with the possibility of a merger of New Southland and VGS. Mr. Hearin and Mr. Else were of the opinion, based on the engineering study of VGS by Gaissert and their own experiences and business judgment, that VGS could become a profitable operation if sufficient capital were injected into the company and if new management were obtained. Although the Gaissert study indicated that a 2- or 3-year period would be expected before VGS could be profitable, they believed that should New Southland merge with VGS, the necessary capital to turn VGS around could be provided from the cash flow generated by New Southland's operations. Moreover, they felt that a merger of the two companies would be beneficial because it would offer diversification for New Southland's

operations and thereby reduce their investment risk due to the heavy dependence of New Southland on the availability of crude oil. Mr. Hearin and Mr. Else also felt that a merger of New Southland and VGS would be beneficial in that they were compatible companies and complimented each other from a cash flow standpoint. Both companies were seasonal operations; New Southland's revenues were generated primarily in the summer while VGS could be expected to generate earnings in the winter.

Both Mr. Hearin and Mr. Else were aware of the net operating loss carryover and the investment credit carryover held by VGS; these two attributes were considered by them in projecting the cash flow of the combined companies.

As a result of the Gaissert studies and subsequent renegotiation conducted by Mr. Gaissert, Trans-Canada on September 25, 1967, agreed to a reduction of the minimum contract demand, thereby reducing the amount VGS had to pay as a minimum amount each year. The contract, after the amendment, still had a take-or-pay clause which obligated VGS to minimum payments of approximately $45 million over the next 24-year period. In July 1967 the authorized capital stock of VGS was increased from 25,000 shares to 50,000 shares. On October 3, 1967, an additional 17,778 shares were issued to existing shareholders at $45 per share. After the additional 17,778 shares were issued, there were a total of 25,278 shares of capital stock outstanding with Rhoades holding the largest block. At that time, Mr. Hearin was the owner of record of 1 share of VGS.

In November 1967 Mr. Hearin, on behalf of VGS offered Mr. Gaissert the position of president of VGS which he accepted on November 12, 1967, effective as of January 1, 1968.

On December 1, 1967, New Southland and VGS entered into an agreement to transfer New Southland's assets to VGS in exchange for 126,431 shares of common stock of VGS and the assumption of New Southland's liabilities. As part of the agreement, the holders of the 6-percent convertible debentures exchanged the debentures for an additional 11,426 shares of stock. The original shareholders of VGS retained their shares. On January 1, 1968, New Southland and VGS merged, pursuant to section 368(a)(1)(C) of the Internal

Revenue Code, with VGS as the surviving corporation. Thereafter, the operations of VGS consisted of two divisions, namely the Vermont division and the Southland division. On January 25, 1968, VGS issued 126,431 shares of its common stock to New Southland. Subsequently, New Southland was liquidated and the VGS stock was distributed to its shareholders pro rata.

It was the opinion of the principal shareholders of New Southland and the president of VGS that Vermont law prohibited New Southland from being the surviving corporation in the merger. Moreover, the Federal Power Commission permit authorizing the importation of natural gas, the Presidential permit authorizing facilities on the Vermont-Canadian border, the Canadian Natural Energy Board permit authorizing the exportation of natural gas, and the Trans-Canada contract were all nontransferable; thus, it was the opinion of the principal shareholders of New Southland and the president of VGS that considerable time and expense would be required to secure new permits and renegotiate the contract should New Southland be the survivor of the merger. For these reasons New Southland and VGS combined operations in a tax-free reorganization with VGS as the surviving entity. On January 5, 1968, the Commissioner of Internal Revenue issued a favorable ruling letter to the effect that the proposed plan constituted a tax-free reorganization under section 368(a)(1)(C) of the Internal Revenue Code.

Following the merger, Mr. Gaissert controlled the operations of the Vermont division. He established a budget, formulated a plan to further develop the distribution system, instituted substantial internal changes in operations, and instituted a major marketing effort to obtain new customers. After the merger, the Southland division began to send substantial sums of money to the Vermont division which was generated by the cash flow of the Southland operations; these funds were used to finance expansion of the natural gas distribution system. Funds invested in the Vermont division by the Southland division following the merger amounted to approximately $4,700,000.

Subsequent to the merger the Vermont division of VGS has had an increase of 3,063 residential customers, amounting to an increase of 96.8 percent and an increase of 577 commercial

customers, an increase of 133.3 percent. Three new towns in Vermont have been connected to the natural gas system and major portions of towns previously served have been added. The Vermont division of VGS has equaled or exceeded Mr. Gaissert's financial projections and has become a highly profitable and viable operation. For the calendar year 1971, the Vermont division of VGS reported a net profit per books before Federal taxes of $12,702. For the calendar years 1972, 1973, and 1974 the Vermont division of VGS reported a net profit per books before Federal taxes of $103,400, $96,568, and $771,534, respectively. For the 11 months of the calendar year 1975 ending in November, the Vermont division of VGS had pretax earnings of $1,282,137.

Prior to the merger, Old Southland reported taxable income as follows:

| Taxable year ended | Taxable income |
|---|---|
| 7/31/66 | $1,178,302.24 |
| 7/1/67 | 1,243,078.05 |
| 12/31/67 | 479,673.21 |

Prior to the merger, Vermont Gas Systems, Inc., reported net operating losses for its taxable years as follows:

| Taxable year | Net operating loss |
|---|---|
| 1965 | $104,144 |
| 1966 | 396,931 |
| 1967 | 319,588 |

The net operating loss carryover of VGS as of December 31, 1967, amounted to $820,663. As of December 31, 1967, VGS had the following investment credit carryover:

| | |
|---|---|
| From 1965 | $4,767 |
| From 1966 | 201,427 |
| From 1967 | 27,676 |
| 1967 recapture | (180) |
| Total | 233,690 |

The investment credit of VGS for the taxable year 1968 was as follows:

| Year | Division | Investment credit |
|------|----------|------------------:|
| 1968 | Southland.................................. | $13,243 |
| 1968 | Vermont.................................... | 36,829 |

The Vermont division of Vermont Gas Systems, Inc., experienced and reported postmerger losses as follows:

| Taxable year | Operating loss |
|--------------|---------------:|
| 1968 .......................... | $436,517 |
| 1969 .......................... | 398,869 |
| 1970 .......................... | 317,833 |
| 1971 .......................... | 148,015 |

At the time of the merger, Mr. Else and Mr. Hearin expected that losses would be experienced by the Vermont division for several years; however, they believed that substantial profits could be earned after the completion of contemplated changes in operation.

On July 7, 1970, Vermont Gas Systems, Inc., changed its name to VGS Corp., also known as "VGS Corporation, successor by merger to Southland Oil Company."

In the statutory notices of deficiency dated May 21, 1974, and October 3, 1974, the Commissioner determined allowable depreciation as follows:

SCHEDULE OF DEPRECIATION AND ADJUSTMENT

| Taxable year ended | Depreciation claimed | Respondent's allowable | Respondent's adjustment |
|--------------------|---------------------:|-----------------------:|------------------------:|
| 7/31/66................... | $491,573.34 | $241,306.11 | ($250,267.23) |
| 7/31/67................... | 550,448.64 | 296,235.05 | (254,213.59) |
| 12/31/67 ................. | 234,524.13 | 130,521.16 | (104,002.97) |
| 12/31/68 ................. | 570,986.98 | 322,479.38 | (248,507.60) |
| 12/31/69 ................. | 578,491.03 | 343,326.48 | (235,164.55) |
| 12/31/70 ................. | 554,945.19 | 382,776.36 | (172,168.83) |
| 12/31/71 ................. | 630,066.00 | 508,588.54 | (121,477.46) |

Respondent, in the statutory notice of deficiency, determined, by use of the relative in-use value method, that substantial intangible assets were acquired in the August 2, 1965, purchase of the Southland Co. partnership assets and the stock of Old Southland, subsequently liquidated pursuant to section 332 of the Internal Revenue Code of 1954. Included in the purchase price respondent determined relative in-use intangible value consisting of the following: going concern,

continued management and labor force, trade name, industry associations, crude oil source supply, asphalt market contract, and foreign oil import quota. The allocable purchase price was determined to be $3,733,500. Fixed-asset value subject to depreciation was determined to be $2,969,685 while value attributable to land and intangibles was determined to be $176,134 and $2,400,000, respectively. Thus, total relative value was determined to be $5,545,819. While $1,999,215 was attributable to depreciable assets, $118,576 was attributable to land and $1,615,709 was attributable to intangible assets.

The following reallocations were made by respondent:

|  | Cost per return | Allocation |
|---|---|---|
| Depreciable assets (including $10,000 appraisal fee)............ | $3,557,366 | $1,999,215 |
| Excessive value of Crupp Refinery.......................................... | (577,681) |  |
| Transport equipment (accepted per return)........................... | (168,786) | (168,786) |
| Autos and trucks (accepted per return).................................. | (45,281) | (45,281) |
| Total ............................................................... | 2,765,618 | 1,785,148 |

Therefore, respondent reallocated the purchase price and determined basis of the acquired fixed assets as follows:

| Asset | Basis[1] |
|---|---|
| Rogerslacy Refinery ............................................................................... | $822,108 |
| Crupp Refinery....................................................................................... | 272,580 |
| Dealer service station equipment....................................................... | 99,732 |
| Refinery wholesale ............................................................................... | 220,486 |
| Bulk plants.............................................................................................. | 57,941 |
| Service stations ..................................................................................... | 159,057 |
| Company-operated stations................................................................. | 11,384 |
| Loan equipment ..................................................................................... | 7,306 |
| Vicksburg Terminal (½ interest)......................................................... | 49,813 |
| Gas pipeline ............................................................................................ | 34,760 |
| Oil field service ..................................................................................... | 7,646 |
| Asphalt storage ..................................................................................... | 29,421 |
| Emulsion storage ................................................................................... | 1,873 |
| Autos and trucks.................................................................................... | 45,281 |
| Transports............................................................................................... | 168,786 |
| Furniture and equipment..................................................................... | 8,672 |
| Miscellaneous ........................................................................................ | 2,369 |

[1] These figures represent the ratio of allocated purchase price to cost per return.

The Commissioner further determined that petitioner had not established that the principal purpose of the acquisition of Vermont Gas Systems, Inc., by Southland Oil Co. and ultimately its shareholders was not the avoidance or evasion of Federal income tax by securing the benefit of Vermont Gas

Systems' net operating losses and investment tax credit. Therefore, he disallowed the net operating loss deduction of $820,633 and investment credit carryover of $233,690 claimed by petitioner in the taxable year 1968. Applying the same theory, the Commissioner disallowed investment credit carryovers of $54,432 in each of the taxable years 1969 and 1970 and $136,081 in the taxable year 1971.

## OPINION

New Southland acquired assets of the Southland partnership and the stock of Old Southland for a lump-sum purchase price; the corporation was immediately liquidated under section 332 and a cost basis assigned to the assets under section 334(b)(2). These entities had been conducted as an integrated business operation[2] and the question we must decide is what part, if any, of the lump-sum purchase price is properly allocable to nondepreciable intangible assets.

Respondent contends that petitioner's allocation of purchase price to fixed assets includes a substantial amount actually attributable to nondepreciable intangible assets. It is respondent's position that only $1,999,215 of the purchase price is properly allocable to depreciable assets. More particularly, he contends that the net purchase price New Southland assigned to depreciable assets included the "enhanced value" of those assets resulting from their presence as a part of an integrated and established business operation and that such enhanced value together with other intangibles, presumably goodwill, had a nondepreciable value of $1,615,709. We think respondent has appreciably overstated his case.

Respondent's position is premised upon the notion that New Southland acquired $5,344,919 worth of assets for a mere $3,735,000. However, from the record it is clear that the negotiations for the purchase and sale of the combined Southland properties were conducted at arm's length and that the resulting sales agreement was the result of hard bargaining between the parties, all of whom were well informed of all relevant facts. It is well settled that the fair

---

[2] Sec. 1.167(a)–5, Income Tax Regs., requires that a lump-sum purchase price be allocated to depreciable assets in proportion to their fair market values. Accord, sec. 1.334–1(c)(4)(viii), Income Tax Regs.

market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both reasonably informed as to all relevant facts.[3] *Jack Daniel Distillery v. United States,* 379 F.2d 569, 574 (Ct. Cl. 1967). Petitioner's allocation of the purchase price among the depreciable assets comports with reality and was the result of arm's-length bargaining. This is the best evidence of fair market value and we are satisfied that the lump-sum purchase price paid was equal to the fair market value of the assets of the combined Southland operations. *Florida Publishing Co. v. Commissioner,* 64 T.C. 269 (1975), affd. without published opinion (5th Cir. 1977).

Although the allocation of the purchase price to the assets was not embodied in the text of the agreement, it is clear that the bargain was struck based upon the depreciable fixed asset values assigned in the Purvin & Gertz report and that the parties accepted those values as an accurate reflection of the fair market value of the depreciable assets of the combined Southland companies. We find this report, prepared by a firm skilled in the valuation of oil and gas properties and related businesses and completely independent of both parties, entitled to substantial weight.

We, therefore, turn to the question of whether goodwill was among the assets acquired by New Southland. Certainly the absence of any allocation is not conclusive as to the existence of goodwill, *Copperhead Coal Co. v. Commissioner,* 272 F.2d 45 (6th Cir. 1959), affg. a Memorandum Opinion of this Court. However that fact, in conjunction with the fact that the existence of goodwill was not discussed in the sale negotiations or the Purvin & Gertz report, strongly suggests its absence. *Wilmot Fleming Engineering Co. v. Commissioner,* 65 T.C. 847, 860 (1976). In the instant case, the tax consequences to the seller and buyer differed. By reason of the allocations of the parties, the sellers realized substantial recapture of depreciation taxed at ordinary income tax rates whereas goodwill would have been treated as a capital asset and the payments therefor capital gain. In addition, neither New Southland, the buyer, nor the combined Southland companies,

---

[3] *Moss American, Inc. v. Commissioner,* T.C. Memo. 1974–252.

the sellers, reflected goodwill as an asset on their respective books, also suggesting its absence. *Wolcott v. Commissioner*, 39 T.C. 538, 544 (1962).

To support a finding that goodwill was transferred, it is necessary that the business was such that the purchaser could expect not only continued excess earning capacity but also some competitive advantage or continued patronage; i.e., the expectancy that old customers satisfied with the quality of services or product would return. *Wilmot Fleming Engineering Co. v. Commissioner, supra; Miller v. Commissioner*, 56 T.C. 636 (1971). The competitive atmosphere in which Southland's products were sold belies any conclusion that any competitive preference existed in the Southland business.

While it is true that the trade name "Southland" was carried over to the new corporation, the evidence reveals that it carried with it little if any product association or competitive advantage. The Southland products were sold primarily because of competitive pricing and not product identification. Sales of gasoline were primarily dependent upon the "pump price" and not product association or identification with the name "Southland" and asphalt was sold on a contract-bid basis. Where price is the prime competitive factor, little goodwill can be present. Moreover, the profits generated by the Southland operations were little more than the minimum expected return on the investment in tangible assets and although management would continue in place, Mr. Constantin, the driving force behind the operations, would no longer be associated with the enterprise. While Southland had a crude oil supply contract calling for up to 7,500 barrels per day from the Heidelburg, Encutta, and Yellow Creek fields until 1999, the price under that contract was the posted field price; therefore, no particular competitive advantage was gained.

Respondent has placed a great deal of emphasis upon the foreign oil import quota which allowed small refineries to take advantage of lower foreign crude oil costs existing at that time. However, that quota was merely a nontransferable Government rebate subject to cancellation at any time and in most cases merely enabled the small refineries to compete with the majors and remain in business. In our opinion, the import quota created no goodwill capable of being transferred

by Old Southland. Cf. *Zorniger v. Commissioner,* 62 T.C. 435 (1974). The quota was merely something that accrued to any small domestic refinery based on the particular refinery's throughput and, therefore, gave no competitive advantage to the Southland companies vis-a-vis other small refineries.

Finally, the capitalized net earnings[4] of the combined Southland companies juxtaposed with the fair market value of the net tangible assets reveal no excess earning capacity which strongly suggests the absence of goodwill. *Wilmot Fleming Engineering Co. v. Commissioner, supra; Staab v. Commissioner,* 20 T.C. 834 (1953).

After careful consideration of the evidence we can only conclude that the combined Southland companies were engaged in an industry where a high degree of competition existed and that preexisting business relationships could be expected to continue only so long as New Southland continued to meet that competition.

Accordingly, we hold that no goodwill was acquired by New Southland in its acquisition of the combined Southland companies.[5]

As distinguished from goodwill, respondent further asserts that substantial going-concern value was acquired by New Southland. See *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U.S. 287, 313 (1933). Going-concern value is, in essence, the additional element of value which attaches to property by reason of its existence as an integral part of a going concern. See *Conestoga Transportation Co. v. Commissioner,* 17 T.C. 506, 514 (1951). In *United States v. Cornish,* 348 F.2d 175 (9th Cir. 1965), the Ninth Circuit characterized the intangible going-concern element of an operating business as follows:

> The going concern element of an operating business cannot be classified as an enhancement in market value of depreciable assets for purposes of depreciation. While the individual tangible assets may wear out and be replaced, going concern value does not wear out with the individual assets.

---

[4] Using the A.R.M. 34 method, see Rev. Rul. 68–609, 1968–2 C.B. 327, the fair market value of the net tangible assets purchased by New Southland capitalized conservatively at 8 percent is less than the average net after tax annual earnings for the 5-year period ending in the taxable year 1965. See *American Fork & Hoe Co. v. Commissioner,* a Memorandum Opinion of this Court dated Sept. 22, 1943.

[5] See *Concord Control, Inc. v. Commissioner,* T.C. Memo. 1976–301.

And when a worn out tangible asset must be replaced the cost to the business of doing so is not augmented by the fact that the acquisition is to become part of a going concern. Thus it is not within the meaning of section 167 of the Code to allow taxpayers to recoup the cost they paid for the going concern value through an increased depreciation base on the tangible assets. * * * [348 F.2d at 185. Fn. ref. omitted.]

The theory is that even in the absence of goodwill, excess earning capacity, and the like, the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership, is a vital part of the value of a going concern. *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 (5th Cir. 1971); *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 235 (1975). It is, however, intangible and hence nondepreciable. Therefore, that portion of the lump-sum purchase price attributable to going-concern value must be excluded from the basis of the depreciable assets. *Northern Natural Gas Co. v. United States,* 470 F.2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1975); *Computing & Software, Inc. v. Commissioner, supra.*

The combined business operations acquired by New Southland had in place and operational the Crupp and Rogerslacy Refineries, a terminal, a gas pipeline, six bulk plants and service stations, and various other necessary equipment in addition to a source of supply for crude oil and gasoline and the Southland trade name. Moreover, the Southland operations were able to survive and make a profit in a highly competitive industry during a time when many small refineries were unable to break even without the application of the foreign oil import quota. The business acquired by New Southland was more than a mere collection of assets. It was rather a viable, functioning, and going concern capable of generating a profit, and New Southland acquired a valuable property right as a result.

Petitioner argues that because the Purvin & Gertz appraisal of the Southland companies made no allocation to going-concern value and because that report formed the basis of the parties' agreement no allocation is required. However, a taxpayer cannot preclude respondent from making an allocation to intangible going-concern value simply because such an allocation was not made or discussed by the parties where it is warranted by the economic realities. *Gregory v. Helvering,* 293

U.S. 465 (1935). While the opinion of an expert is entitled to due consideration, it is not binding on this Court. See, e.g., *Webster v. Offshore Food Service, Inc.*, 434 F.2d 1191 (5th Cir. 1970); *Tracy v. Commissioner*, 53 F.2d 575 (6th Cir. 1931).

As a related issue, respondent contends that the fair market value of the Crupp Refinery was no more than 200 percent of Old Southland's book value at time of the sale. He argues that because it was situated on leased property and in an "aged and deteriorated" condition the value determined by the Commissioner was realistic and reasonable. We are, however, somewhat surprised at respondent's characterization of the physical condition of the Crupp Refinery because his own agent testified that new additions had been made over the years and in his report wherein he capitalizes that facility he . states that the refinery would be in "good working condition" at the expiration of the lease in February 1971. We presume that respondent's determination of value stems primarily from his concern that the lease, due to expire in February 1971, would not be renewed because of the animosity existing between Mr. Constantin and Mr. Hogue, the landowner.'

However, as we have previously decided the negotiations for the sale of the Southland companies were conducted at arm's length and we can only conclude that the purchase of the Crupp Refinery was the result of hard bargaining. The sellers were unwilling to make any concessions on account of the leasehold situation and the buyers were confident that a new lease agreement could be worked out after the departure of Mr. Constantin. The Purvin & Gertz report concluded that the refinery was conservatively worth $997,756, the amount allocated thereto by New Southland. We hold that this figure was an accurate reflection of the value of the Crupp Refinery and the parties are entitled to have their agreement respected in this regard. *Florida Publishing Co. v. Commissioner, supra.*

While we recognize that any allocation is somewhat speculative, we have carefully considered the testimony and the numerous exhibits offered by both parties and it is our best judgment that the following allocations accurately reflect the going-concern value of the combined Southland companies.

| Asset | Purchase price | Going concern value | Adjusted purchase price[1] |
|---|---|---|---|
| Service station property (rental)............ | $2,518 | $250 | $2,268 |
| Crupp Refinery ......................................... | 997,756 | 59,865 | 937,891 |
| Selling equipment...................................... | 5,002 | 500 | 4,502 |
| Gas pipeline.............................................. | 53,853 | 3,231 | 50,622 |
| Rogerslacy Refinery ................................. | 1,269,417 | 76,165 | 1,193,252 |
| Vicksburg Refinery ................................... | 77,172 | 3,858 | 73,314 |
| Bulk plants (6)........................................... | 89,764 | 4,488 | 85,276 |
| Service stations (exclusive of land) ....... | 245,600 | 19,648 | 225,952 |
| Company service equipment.................... | 17,637 | 1,058 | 16,579 |
| Dealer service equipment ....................... | 153,994 | 9,239 | 144,755 |
| Loan equipment......................................... | 11,319 | 679 | 10,640 |
| Transports.................................................. | 168,786 | 0 | [2]168,786 |
| Auto and trucks........................................ | 42,381 | 0 | [2]42,381 |
| Oil field service........................................ | 11,846 | 710 | 11,136 |
| Refinery wholesale ................................... | 340,453 | 27,236 | 313,217 |
| Miscellaneous........................................... | 62,386 | 4,990 | 57,396 |
| Stock of Yazoo Industrial and Mississippi Business............................ | 1,500 | 0 | 1,500 |

[1] Purchase price less the amount attributable to going-concern value.

[2] Conceded by respondent.

The final issue for our decision is whether the principal purpose of the acquisition of VGS by New Southland and ultimately its shareholders was the evasion or avoidance of Federal income tax by securing the benefit of net operating losses and investment credits which they otherwise would not have enjoyed within the meaning of section 269 of the Code.[6]

---

[6] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.
(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

(b) POWER OF SECRETARY OR HIS DELEGATE TO ALLOW DEDUCTION, ETC., IN PART.—In any case to which subsection (a) applies the Secretary or his delegate is authorized—

(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

(2) to distribute, apportion, or allocate gross income, and distribute, apportion, or

Petitioner admits that the requisite control was acquired by New Southland and its shareholders but argues that it was done without the prohibited state of mind. For section 269 to apply, the tax evasion or avoidance purpose must outrank, or exceed in importance, any other single purpose. *D'Arcy-MacManus & Masius, Inc. v. Commissioner*, 63 T.C. 440 (1975); *Canaveral International Corp. v. Commissioner*, 61 T.C. 520 (1974). While one's purpose is in theory purely subjective, realistically, it can only be ascertained by objective facts. The determination of the Commissioner is presumed correct and the burden of proof rests squarely on petitioner.[7] *Vulcan Materials Co. v. United States*, 446 F.2d 690 (5th Cir. 1971); *American Pipe & Steel Corp. v. Commissioner*, 243 F.2d 125 (9th Cir. 1957), cert. denied 355 U.S. 906 (1957); *Industrial Suppliers, Inc. v. Commissioner*, 50 T.C. 635 (1968).

To properly weigh and evaluate the various motivations of New Southland, it is necessary to view all the events leading up to and following the acquisition of VGS. *D'Arcy-MacManus & Masius, Inc. v. Commissioner, supra.* The record reveals that the principals of New Southland were aware of the VGS operation for some time and that they knew of the Gaissert

allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

(3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

[7] Respondent states on brief that he no longer seeks to buttress the presumption of correctness attaching to the statutory notice of deficiency by use of sec. 269(c). Indeed, computations under that section reveal that the consideration paid by New Southland in acquisition of VGS was approximately 70 percent of the adjusted basis in the percentage interest of the assets acquired plus the tax benefit not otherwise available; hardly insubstantial.

study and agreed with its conclusions. Mr. Gaissert concluded that the financial difficulties experienced by VGS stemmed from inexperienced management, lack of capital, and a gas supply contract which required excessive payments under the minimum take-or-pay provision. In addition, he maintained that the market emphasis should be shifted away from commercial customers and instead focused upon residential consumers. After the reorganization it was precisely these changes which were made and perhaps more importantly, the Vermont division of VGS continued to conduct substantial business activities and was certainly anything but a mere corporate shell. These facts lend substantial credence to petitioner's contention. *Naeter Bros. Publishing Co. v. Commissioner,* 42 T.C. 1, 8 (1964).

Respondent argues that because New Southland was a successful and profitable business and VGS was financially distressed and the principals of New Southland were aware of the VGS tax attributes that the principal purpose of the acquisition was tax avoidance. Indeed, the operating losses and investment credits were considered and, in fact, used in calculating the amount of capital which New Southland would be able to supply to VGS. Complicated business transactions do not take place in a vacuum and we find this to be nothing more than prudent business planning. *D'Arcy-MacManus & Masius, Inc. v. Commissioner, supra; Glen Raven Mills, Inc. v. Commissioner,* 59 T.C. 1, 15 (1972). Moreover, simply arguing that a profitable corporation acquired a loss corporation and hence section 269 applies merely begs the question.

Mr. Hearin and Mr. Else testified that it was felt that the acquisition of VGS would provide a sound opportunity for diversification in a related business area and that from a cash flow standpoint the merger was particularly attractive because the operations of New Southland reached their peak in the summer months while VGS could be expected to provide a substantial source of funds in the winter months. We find their testimony to be forthright, credible, and supported by the record. Moreover, based on the Gaissert study we conclude that the principals of New Southland had substantial reason to be optimistic because New Southland

was in a position to provide enough cash to meet the financial requirements of VGS.

After the acquisition, the assets of New Southland were subject to demands of VGS' creditors and potential liability under the long-term gas supply contract with Trans-Canada. After the reorganization New Southland injected over $4 million into the operations of VGS in addition to the purchase price. While losses continued until 1971, profits were realized in 1971 through 1973 and in 1974 and 1975 substantial pretax profits were earned. These facts strongly support petitioner's position that the principal purpose of the acquisition was other than the avoidance of Federal income tax. Compare *F.C. Publication Liquidating Corp. v. Commissioner*, 36 T.C. 836, 850 (1961), affd. 304 F.2d 779 (2d Cir. 1962) (wherein the taxpayer did not enter into a single contract which could subject its assets to the creditors of the acquired corporation for longer than 6 months).

Respondent further contends that New Southland could have obtained funds to purchase the stock or the assets of VGS and, therefore, proceeding as they did indicates a tax-avoidance purpose, citing *Canaveral International Corp. v. Commissioner, supra* at 541. In *Canaveral* we stated that "when section 269 is placed in issue, it does require a showing that the most favorable tax route, when that route involves the acquisition of a corporation, was principally motivated by non-tax-related business reasons." While it is true that the methods selected did facilitate the utilization of VGS' tax attributes, petitioner has shown substantial business purpose for the merger as implemented. An acquisition for stock was chosen so that New Southland's future cash flow could be used to finance the future capital requirement of VGS. Not only did Vermont law appear to require the continued existence of VGS as a public service corporation, but also various permits from the State of Vermont, the United States, and Canada authorizing the transaction of business as a public utility were nontransferable and, therefore, considerable time and expense would be required to secure new permits. The evidence is such that we do not believe the transaction was a "C" reorganization simply in an effort to obtain the tax benefits of VGS.

From the record as a whole we can only conclude that the primary purpose of the acquisition of VGS by New Southland and its shareholders was their belief that VGS would become a highly profitable public utility. Accordingly, we hold that the principal purpose of the acquisition was not the avoidance or evasion of Federal income tax and, therefore, section 269 does not operate to deny the carryover of the VGS net operating losses and investment credit.

*Decisions will be entered under Rule 155.*